HUGHES HUBBARD & REED LLP
Ned H. Bassen
Jason Habinsky
Alexander Bogdan
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

Attorneys for Plaintiff
Cenveo Corporation

**JUDGE SCHEINDLIN**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

CENVEO CORPORATION,

                              Plaintiff,

                    -against-

DIVERSAPACK LLC, IRA B. KRISTEL,
AND ALAN J. KRISTEL.

                              Defendants.

------------------------------------------------

**'09 CIV 7544**

COMPLAINT



Plaintiff Cenveo Corporation ("Cenveo"), by and through its attorneys Hughes

Hubbard & Reed LLP, for its complaint herein, alleges against Defendants Diversapack LLC

("Diversapack"), and Ira and Alan Kristel, upon personal knowledge as to itself and its own acts

and upon information and belief as to all other matters, as follows:

### Nature of the Action

1.    Cenveo brings these claims against Defendants because they perpetrated a scheme

to raid uniquely skilled critical employees of Cenveo's Commercial Envelope Manufacturing

Co., Inc. ("CEM"), a company that members of the Kristel family, which includes Ira, Alan,

Steven and Mindy (collectively, "the Kristels"), had sold to Cenveo. Ira and Alan Kristel cherry-

picked CEM's uniquely skilled critical employees to work for their new company, Diversapack,

and in particular at a new facility they are opening.  They did so despite, and in violation of, a number of covenants they had contracted to that prohibit them from raiding these employees.  As a result, Cenveo has suffered and will continue to suffer severe and irreparable harm.

### Jurisdiction and Venue

2.      Jurisdiction of this action is based on 28 U.S.C. § 1332(a), in that the action is between citizens of different States, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

3.      Venue is proper in this District under 28 U.S.C. § 1391, because (a) events or omissions giving rise to Cenveo's claims occurred in this District; and (b) because Ira and Alan Kristel consented to venue in this District by written agreement made before the commencement of this action.

### The Parties

4.      Cenveo provides print and visual communications products and services, including commercial print services, creative services, envelopes, forms and labels, mailing services, and packaging, to a variety of clients, with its principal place of business in Stamford Connecticut.

5.      Diversapack is a packaging company with its principal place of business in Atlanta, Georgia.

6.      Ira B. Kristel is an owner and executive of Diversapack, and a resident of New York.

7.      Alan J. Kristel is an owner and executive of Diversapack, and a resident of New York.

2

**The Sale of Commercial Envelope Manufacturing Co., Inc.**

8.      Members of the Kristel family founded and owned all outstanding shares of CEM, a company that manufactures premium, industry-standard envelopes on various paper materials with a wide variety of types and seals, and provides creative direct mail services to large corporate clients including manufacturers of popular consumer goods, multinational banks, insurance companies, and telecommunications companies.

9.      On July 17, 2007, the Kristels entered into a Stock Purchase Agreement ("SPA") with Cenveo whereby the Kristels sold all of the capital stock of CEM to Cenveo for approximately $230 million, of which a portion was used to repay CEM's debt.  A copy of the SPA is affixed hereto as Exhibit A.

10.      In connection with the purchase, Cenveo also agreed to continue to retain the Kristels in high-level positions pursuant to employment agreements (the "Employment Agreements") dated July 17, 2007.  A copy of Alan Kristel's Employment Agreement is affixed hereto as Exhibit B.  Specifically, the Kristels were retained in the following capacities: Ira - Consultant; Alan - Senior Vice President of Manufacturing; Steven - Senior Vice President and General Manager - Eastern Region; and Mindy - Director Sales and Marketing.  Ira and Mindy Kristel also entered into noncompetition agreements dated July 17, 2007 ("Noncompetition Agreements").  A copy of Ira Kristel's Noncompetition Agreement is affixed hereto as Exhibit C.

11.      The purchase transaction closed on August 30, 2007.

**CEM's Special and Unique Employees**

12.      CEM's management-level positions include General Manager, Plant Supervisor, and Sales Manager (collectively, "the Managers").

3

13.     CEM's Managers oversee the plants' finances and production operations. Their services are special and unique because of the small universe of managers who can simultaneously: (1) understand, anticipate, and meet the clients' tailored and specific needs; (2) run the operations of a sophisticated plant; and, most importantly, (3) understand and coordinate the hypertechnical aspects of production for a company that is constantly incorporating new, cutting-edge machines and methods to serve major corporate clients.

14.     CEM's Adjuster positions include A-level, B-level, and C-level Adjusters (collectively "the Adjusters").

15.     A-level Adjusters set up, troubleshoot, and adjust for size, shape, and other custom specifications multiple types of sophisticated, CEM-modified machines. These machines include the CEM Altoona, Pennsylvania Plant's Cerutti presses, which are unique, high-end, Italian-manufactured machines requiring years of experience to master the setting up, troubleshooting and adjustment of such machines. Upon information and belief, no other envelope company uses Cerutti presses on the front end of the business as they do. CEM generally requires an Adjuster to spend at least five years training on the job to qualify as an A-level Adjuster.

16.     B-level Adjusters set up, adjust for size, shape, and other custom specifications, and occasionally troubleshoot one to two types of sophisticated, CEM-specific machines. CEM generally requires an Adjuster to spend up to three years training on the job to qualify as a B-level Adjuster. One distinction between A- and B-level Adjusters is the ability to troubleshoot. For example, an Adjuster must detect whether a poly patch is either pulling back or wrinkling. An A-level Adjuster is much more likely to detect such a problem, and be familiar with the necessary adjustment techniques, than is a B-level Adjuster.

4

17.    C-level Adjusters are trainees that are paired up with more advanced Adjusters. They are occasionally able to operate one type of sophisticated, CEM-specific machine. CEM generally requires a C-level Adjuster to spend up to a year training on the job before being considered for advancement to a B-level position. Each day that a more advanced Adjuster spends training a C-level Adjustor costs the more advanced Adjuster, and CEM at large, substantial investments in training time and resources.

18.    Regardless of level, each Adjuster's services are special and unique because of the Adjusters' unusual knowledge required to run the Cerutti press, their ability to operate Company-specific, specially-modified printing equipment, and the experience required to follow work orders properly and constantly adjust CEM's sophisticated equipment in accordance with CEM's rigorous standards. In addition to learning how to operate the Cerutti press, it takes years for CEM Adjustors to become familiar with the other complicated machines they use, which include W&D202s, W&D399s, and Smithe SWs. Moreover, the machine setup process is critical and requires special training. Setup includes the placement of knives and panel-cutters which, if incorrectly placed, can cause machine damage requiring large sums of time and money for repair. Finally, Adjusters are special and unique as a result of CEM's special and unique printing methods - much of CEM's printing is high-end, process color flexo-printing. It takes Adjusters years to familiarize themselves with the components of this process - from the anilox rollers which come in different line screens and cell densities, to identifying screens or tints in the artwork, to understanding how any of these components affects the color of the art.

19.    CEM's Graphics Department positions include Graphics Lead and Graphic Artist (collectively "the Graphics employees").

20.     The Graphics employees make envelope art and work with clients to manipulate clients' proposed art to be compatible with envelope specifications and sophisticated, CEM-specific equipment.  Their services are special and unique because not only must they be extremely talented in their field, they also must learn how to make envelope art compatible with sophisticated, CEM-specific equipment.  Like the Adjusters, the Graphics employees must be able to detect screens and tints, and understand how they affect the color of the art.

21.     The Graphics Lead is special and unique because a very small universe of Graphics professionals can look at a printed piece and determine how to change the screen dots to affect the color in the final print.

22.     Similarly, the Graphic Artists must familiarize themselves with screen dots and their effect on the color in the final print.  While the Graphics Lead, by virtue of longer experience with CEM, can ordinarily execute this process on the first, second, or third attempt, the Graphic Artists ordinarily require several attempts even with their well-trained eyes.

23.     Additionally, the Graphics Lead and Graphic Artists are special and unique because of their fluency with regard to an unusual number of complicated, cutting-edge software products, including Adobe Illustrator and Quark Express.  CEM trains the Graphics Lead and Graphic Artists to use these programs in-house.

24.     CEM's Sales Managers and Sales Representatives (collectively, "the Sales employees") form and develop relationships with clients and present CEM's sophisticated services at a highly technical level.  Their services are special and unique because it is exceedingly difficult to find Sales employees who understand and effectively communicate to Cenveo's clients the details, capabilities, and limitations of Cenveo's sophisticated production process.  This is especially true in the case of selling the high-level flexology plate services

6

available at the CEM Altoona plant. Each CEM Sales employee works with CEM for several years before attaining the requisite level of knowledge and communication skills that are specific to CEM's services.

25. CEM's Schedulers perform the critical role of scheduling the positioning and sequencing of production. The Scheduler ensures that CEM maximizes productivity and efficiency by running various orders on the correct machines at the right sequence. The Scheduler must know the print capabilities of each type of machine, assess and anticipate whether the order is a short-run or long-run order, and gang runs on machines using certain sizes and equipment. Several years of experience working with CEM, and a very high level of knowledge about the technical aspects of CEM's production, are required to do this job.

26. CEM also employs a highly-trained Electronics Expert. The Electronics Expert performs electronic diagnostics, repairs, modifications and upgrades on sophisticated, cutting-edge, CEM-specific machines. In addition, the Electronic Expert must be fluent in programming Programmable Logic Controllers ("PLCs"). Accordingly, the Electronic Expert performs services that are special, unique, and require a skill set rare in this industry.

27. CEM also employs an Electrician. The Electrician assists the Electronics Expert in performing electronic diagnostics, repairs, modifications, and upgrades on sophisticated, cutting-edge CEM-specific machines. The Electrician also must work quickly to fix electrical and other technical problems with CEM's systems and machines. It takes several years of on-the-job training for the Electrician to perform these tasks effectively. Without the Electrician, CEM is less able to avail itself of the sophisticated, cutting edge machines that help make CEM's products the industry standard.

7

**The No-Raiding Provisions**

28.    By virtue of the fact that members of the Kristel family had been the founders and owners of CEM and would continue to provide services to CEM in high-ranking positions, they had and continue to have access to CEM's highly confidential information and trade secrets. The Kristels also had and continue to have detailed personal knowledge of the services provided by CEM's employees and, in particular, knew the identity of the uniquely skilled critical employees. CEM's most valuable and unique employees were and continue to be critical to CEM's business and are extremely difficult to replace. Accordingly, as essential consideration for Cenveo's purchase of CEM's stock, Cenveo required specific restrictions in the SPA, Noncompetition Agreements and Employment Agreements that prohibit the Kristels from raiding CEM's employees, as they now have done. Cenveo would not have entered into the purchase transaction without the restrictions prohibiting the Kristels from such raiding. To protect itself, Cenveo negotiated and obtained covenants in the SPA, Noncompetition Agreements and Employment Agreements that prohibit the Kristels (the "Stockholders") from raiding CEM's (the "Company") or Cenveo's (the "Buyer") employees.

29.    Section 6.7(b) of the SPA provides that:

> If the Closing occurs for a period of 60 months beginning on the Closing Date, no Stockholder will, and each Stockholder will cause his, her or its Affiliates not to directly or indirectly, . . . (iv) otherwise engage or participate in any effort or act to induce any Person to discontinue a relationship with the Company or its Subsidiaries or Buyer or any of its Affiliates.

30.    Section 6.7(e) of the SPA further provides:

> The parties acknowledge and agree that the restrictions . . . are a reasonable and necessary protection of the immediate interests of Buyer, and any violation of these restrictions would cause substantial injury to Buyer and that Buyer would not have entered into this Agreement and the other Transaction Documents without receiving the additional

8

consideration offered by the Stockholders in binding themselves to these restrictions. In the event of a breach or a threatened breach by the Stockholders or any Affiliate of the Stockholders of these restrictions, Buyer will be entitled to an injunction restraining the Stockholders or their Affiliates, as applicable, from such breach or threatened breach (without the necessity of proving the inadequacy as a remedy of money damages or the posting of a bond); provided, however, that the right to injunctive relief will not be construed as prohibiting Buyer from pursuing any other available remedies, whether at law or in equity, for such breach or threatened breach.

31.     The Noncompetition Agreements have provisions identical to those contained in

Section 6.7 of the SPA.

32.     Alan Kristel's Employment Agreement provides in Section 6(b) that:

At all times during your employment with the Company and for a period of two years after the date of the termination of your employment with the Company, you will not, directly or indirectly: (i) solicit for employment, recruit or hire, either as an employee or a consultant, any employee, consultant or independent contractor of any Company Entity who was an employee, consultant or independent contractor of any Company Entity as of the date of this Agreement or at any time during the 12 months prior to your termination of employment; (ii) induce or attempt to induce any employee, consultant or independent contractor of any Company Entity who was an employee, consultant or independent contractor of any Company Entity as of the date of this Agreement or at any time during the 12 months prior to your termination of employment to terminate his or her employment with, or otherwise cease his or her relationship with, the Company. . . .

33.     The Employment Agreement further provides in Section 6(d):

You acknowledge and agree that the restrictions contained in Sections 6(a), (b) and (c) are a reasonable and necessary protection of the immediate interests of the Company, and any violation of these restrictions would cause substantial injury to the Company and that the Company would not have entered into this Agreement without receiving the protective covenants contained in Sections 6(a), (b) and (c). In the event of a breach or a threatened breach by you or any of your affiliates of these restrictions, the Company will be entitled to an injunction restraining you or such affiliate, as applicable, from such breach or threatened breach (without the necessity of proving the inadequacy as a remedy of money damages or the posting of a bond); provided, however, that the right to injunctive relief will not be construed as prohibiting the Company from

9

pursuing any other available remedies, whether at law or in equity, for such breach or threatened breach.

34.    In December 2007, Ira Kristel ceased working for Cenveo, and in February 2008 the remaining Kristels' employment with Cenveo also terminated.

35.    Shortly thereafter, Ira and Alan Kristel informed Cenveo that they had purchased a substantial ownership in Diversapack, a packaging company. Based upon the information the Kristels provided to Cenveo, the parties agreed by Letter Agreement dated May 30, 2008 (the "Letter Agreement"), that the Kristels would not be in violation of Section 6.7(a) of the SPA and Noncompetition Agreements "solely by virtue of their ownership of, or rendering of services to, a business that manufactures polymer-based flexible films used in the packaging industry." However, Cenveo did not agree to excuse the Kristels from their non-raiding restrictions contained in Section 6.7(b) of the SPA or Noncompetition Agreements, or Section 6(b) of the Employment Agreements. Accordingly, the Kristels continued to be bound by these non-raiding provisions. A copy of the Letter Agreement is affixed hereto as Exhibit D.

**The Defendants' Raiding of CEM Employees**

36.    Cenveo thereafter learned that Diversapack was opening a facility in Altoona, Pennsylvania, the same city where CEM's Altoona facility was located. Although Diversapack does not at presently compete directly for the same customers as CEM, Diversapack is installing Cerrutti presses that are substantially similar to those used by CEM. In essence, the choices are that Diversapack either will be running plastic packaging strata through their machines while CEM is running paper through CEM's machines or Diversapack will be competing directly with CEM. Under either choice, the unique skills necessary to operate both Diversapack's and CEM's Cerrutti machines are virtually identical.

10

37.    Because of their detailed knowledge of the uniquely skilled and critical CEM employees, the Kristels have the inside information needed to enable them to cherry-pick CEM's most valuable employees to work at Diversapack and cripple Cenveo's business, which is exactly what Defendants have done and continue to do despite, and in violation of, the contractual provisions prohibiting them from doing so.

38.    Effective May 2, 2008, John Knoesel, a companywide Sales Representative, resigned from his employment with CEM. Mr. Knoesel informed Cenveo Regional Vice President William Stangroom at a recent dinner that he is presently employed by Diversapack. CEM lost unique and special services with Mr. Knoesel's departure, because it is exceedingly difficult to find Sales employees who understand and effectively communicate to CEM's clients the details, capabilities, and limitations of CEM's sophisticated production process. Mr. Knoesel acquired these abilities over ten years of employment with CEM. Accordingly, Mr. Knoesel has been very difficult to replace.

39.    Effective June 22, 2008, Altoona CEM Plant Manager Jerry Salafrio resigned his employment with CEM. Cenveo was told shortly thereafter by an adhesives supplier that Mr. Salafario was seen working for Diversapack in its California office. An Altoona CEM Plant employee recently saw Mr. Salafrio in Altoona. Mr. Salafario's services were special and unique because it is exceedingly difficult to find a Manager who, like him, can at the same time understand, anticipate, and meet the clients' needs, run the operations of a sophisticated plant, and understand and coordinate the hypertechnical aspects of production for a company that is constantly incorporating new, cutting-edge machines and methods.

40.    Effective October 3, 2008, Altoona CEM Plant Graphics Lead Chad Wilt resigned his employment with CEM. A vendor thereafter informed Cenveo that the Kristels aided Mr.

11

Wilt in setting up his own business and subsequently employed him at Diversapack. Diversapack's online newsletter confirms that Mr. Wilt was hired by Diversapack effective January 5, 2009. Mr. Wilt was the only employee at CEM's Altoona facility able to look at a printed piece and determine how to change the screen dots to affect the color in a final print in relatively few attempts, and was highly fluent in the sophisticated, cutting edge graphics software programs used at CEM that require constant practice and training.

41.    Effective October 31, 2008, CEM Sales Managers Bob Gerardo and Ed Riguardi separated from their employment with CEM. Prior to their separation, Mr. Gerardo and Mr. Riguardi began to complain vigorously about various aspects of their employment. Upon information and belief, they began complaining once they had already secured an offer of employment with Diversapack. Mr. Gerardo's and Mr. Riguardi's employment with Diversapack commenced soon after their separation. Diversapack's website confirms that they presently work for Diversapack ("For all inquiries, please contact: Bob Gerardo and Ed Riguardi"). With the simultaneous departure of Mr. Gerardo and Mr. Riguardi, CEM lost unique and special services because the Sales Mangers had formed and developed strong relationships with clients and were uniquely able to present CEM's sophisticated services at a highly technical level. It is exceedingly difficult to find Sales employees who understand and effectively communicate to CEM's clients the details, capabilities, and limitations, of CEM's sophisticated production process. This is especially true in the case of selling the high-level flexology plate services available at CEM's Altoona plant.

42.    Effective March 20, 2009, Daniel Moran, the Plant Manager for the Carlstadt facility, resigned from his employment with CEM. On information and belief, Mr. Moran is presently employed by Diversapack. CEM lost the special and unique services rendered by Mr.

12

Moran as he drew on twenty-seven years of experience with the company to understand, anticipate, and meet CEM's clients' needs, run the operations of the sophisticated Carlstadt plant, and, most importantly, coordinate the hypertechnical aspects of production for a company that is constantly incorporating new, cutting-edge machines and methods to serve major corporate clients.

43.    The Kristels invited a large group of CEM employees to a party in New York, New York on April 18, 2009. Among the CEM employees attending this party was Bryan Harper, who was then employed as an A-level Adjuster at CEM's Altoona facility.

44.    At this party, the Kristels informed the CEM employees in attendance of their plans to open a large, specialized Diversapack printing plant with approximately 150-180 employees in Altoona. The Kristels also made false statements at this party to the CEM employees regarding CEM's financial state. The Kristels further told the CEM employees at the party that the Kristels were opening a Diversapack plant in Altoona not as a business opportunity for the Kristels or Diversapack, but rather as a service to the Altoona-based CEM employees, whom the Kristels considered "family."

45.    Effective June 19, 2009, Bob Monohan, an A-level Adjuster at CEM's Jersey City, New Jersey plant, resigned from his employment with CEM. Mr. Monohan told the company he was leaving to pursue a career in carpentry. In August 2009, an Adjuster in the Jersey City plant learned that Mr. Monohan is presently employed by Diversapack. Mr. Monahan's special and unique services, the result of his skills and 29 years of on-the-job training with CEM, included his extraordinary ability to set up, troubleshoot, and adjust for size, shape, and other custom specifications the complicated Smithe SW machine. It is extremely difficult to

13

find an Adjuster whose technical skills and extensive experience compare to those of Mr. Monohan.

46.     Effective June 26, 2009, Cirilo Sanchez, an Electrician at CEM's Jersey City plant, resigned from his employment with CEM. On information and belief, Mr. Sanchez is presently employed by Diversapack. CEM has lost the unique and special services provided by Mr. Sanchez, who assisted the Electronics Expert in performing electronic diagnostics, repairs, modifications and upgrades on sophisticated, cutting-edge, CEM-specific machines. CEM has also lost Mr. Sanchez's unique and special ability to fix quickly electrical and other technical problems with CEM's systems and machines. Mr. Sanchez attained this ability over his eleven years with CEM. Without him, CEM is less able to maximize the productivity made possible by CEM's sophisticated, cutting edge machines.

47.     As the evidence continued to mount, in or around June 2009, Cenveo had ample reason to believe that Ira and Alan Kristel had raided critical uniquely skilled CEM employees to work for Diversapack. Accordingly, on June 24, 2009, Cenveo's General Counsel Timothy Davis, Esq. wrote a letter to Alan Kristel stating:

> I am writing to you regarding the recent hiring by Diversapack LLC ("Diversapack") of employees of Cenveo Corporation (the "Company").
>
> I refer you to your employment agreement with the Company dated July 17, 2007, a copy of which is attached. As you'll note, such agreement prohibits you from, among other things, soliciting, recruiting or <u>hiring</u>, directly or indirectly, employees of the Company. Such restriction runs through February 29, 2010. Because you are an investor in and senior manager of Diversapack, we believe the restriction prohibits Diversapack from hiring such employees during the restricted period.
>
> We hereby demand that you cease and desist from such solicitations and/or hirings and comply with the terms of your agreement. We also demand that you compensate us for the damage that we have suffered by your actions.

We expect that you will comply fully with all of your obligations. Of course, if you do not comply with your obligations, we intend to enforce vigorously our legal rights and hold you personally responsible for any damages that we suffer by reason of your actions.

A copy of the June 24, 2009 letter is affixed hereto as Exhibit E.

48.    The Kristels' attorney, William Wachtel, Esq. responded by letter dated July 1, 2009, arguing that the Letter Agreement somehow permitted the Kristels and Diversapack to hire Cenveo's employees. However, Attorney Wachtel overlooked that the Letter Agreement did not change the non-raiding provisions contained in the SPA and Noncompetition Agreements and he completely forgot about the non-raiding restrictions in the Employment Agreements, all which remained in full force and effect. A copy of the July 1, 2009 letter is affixed hereto as Exhibit F.

49.    The next day, Cenveo General Counsel Davis responded, stating:

As I told you, the non-solicitation/non-hire provisions of both the Stock Purchase Agreement and the Employment Agreements prohibit Alan and Steven from soliciting, recruiting or hiring Cenveo employees for any company they are associated with, whether or not it is a competing company. The May 30, 2008 Letter Agreement only acknowledged that their interest in Diversapack was not a breach of Section 6.7(a) and did not address the non-solicitation/non-hire provisions of 6.7(b), which remain in force. It also appears that the extent of their soliciting/recruiting/hiring and their apparent plan to build a facility close to the facility that they sold us in Altoona, Penn. Constitutes corporate raiding.

A copy of Cenveo General Counsel Davis' July 2, 2009 e-mail is affixed hereto as Exhibit G.

50.    Notwithstanding these letters, and several subsequent communications with Attorney Wachtel, Ira and Alan Kristel have continued to raid CEM's uniquely skilled critical employees.

51.    For example, in July and August 2009, Bryan Harber, Rodger White, and Mike McKnight, three highly trained Adjusters from CEM's Altoona plant, resigned from their employment. Upon information and belief, these former CEM employees are now employed by the Kristels and Diversapack or will be employed by the Kristels and Diversapack in the near

15

future. Mr. Harber attended the Kristels' April 2009 party in New York. All of these employees provided unique and special services to CEM. Messrs. Harber and White were A-level Adjusters at CEM's Altoona plant. Mr. McKnight was a B-level Adjuster at CEM's Altoona plant.

52.     To date, CEM has been unable to fill the Adjuster positions vacated by Messrs. Harber, White and McKnight.

53.     CEM Altoona Electronics Expert Jim Miller resigned his employment with CEM, effective July 2, 2009. In response to a question from CEM Altoona General Manager Francis Ball as to where Mr. Miller would be going to work, Mr. Miller responded that "he wanted to try something else." Shortly thereafter, a telephone systems vendor informed Mr. Ball that Mr. Miller had ordered a telephone system for Diversapack's planned Altoona facility. Mr. Miller provided CEM with special and unique services. Production at the CEM Altoona facility has suffered in the absence of Mr. Miller's special and unique ability to program logic controllers and to perform electronic diagnostics, repairs, modifications and upgrades on sophisticated, cutting-edge CEM-specific machines. Without Mr. Miller's special and unique services, CEM is far less able to avail itself of the sophisticated, cutting-edge machines that make CEM's products the industry standard.

54.     Effective August 28, 2009, Jersey City Plant Scheduler David Osborn resigned from his employment with CEM. On information and belief, Mr. Osborn is leaving to work for Diversapack. With Mr. Osborn's departure, CEM is losing his unique and special services in scheduling efficiently the positioning and sequence of production in the Jersey City plant. Over the course of his 22 years with CEM, Mr. Osborn developed the ability to maximize productivity and efficiency by running various orders on the correct machines at the right sequence. Mr. Osborn understood at a high level of technicality the print capabilities of each type of machine,

16

and was keenly able to assess and anticipate whether each order was short-run or long-run. He also developed a strong ability to gang runs on machines using various sizes and equipment.

55.     In attempting to replace the CEM employees Defendants have raided, Cenveo has paid for and posted recruitment advertisements on several search websites including Monster.com and CareerBuilder.com, and in newspapers, and taken other actions. Not surprisingly, Cenveo has been unable to find replacements for the uniquely skilled critical employees whom Defendants have raided. This is because these employees are so uniquely specialized that they are extremely difficult to replace.

56.     Defendants' raiding of Cenveo's employees has caused substantial and irreparable harm. By way of example, as of June, 2009, the Altoona CEM Plant was producing an average of 12.5 million envelopes per day. As a result of the departure of these critical uniquely skilled employees to Diversapack this summer, the Altoona CEM Plant is now capable of producing only an average of 9 million envelopes per day, resulting in substantial losses that will continue to magnify.

57.     The ongoing exodus of CEM employees leaving to work for Diversapack has had an utterly destabilizing effect on Cenveo's CEM. Their departures continue to seriously damage CEM's productivity, cohesion, and morale, in addition to the fact that uniquely skilled critical employees have proven extremely difficult to replace. Cenveo has suffered and will continue to suffer immeasurably.

### Count I

### BREACH OF CONTRACT
(against Ira and Alan Kristel)

58.     Cenveo incorporates by reference and realleges the allegations contained in paragraphs 1 through 57 above as if fully set forth herein.

17

59.     On July 17, 2009, Ira and Alan Kristel entered into the SPA, and Ira also entered into the Noncompetition Agreement, which prohibited them for a period of 60 months from directly or indirectly "otherwise engag[ing] or participat[ing] in any effort or act to induce any Person to discontinue a relationship with the Company or its Subsidiaries or Buyer or any of its Affiliates."

60.     The covenant is enforceable, and reasonable in scope and duration.

61.     Cenveo performed in all material respects all of the terms and conditions of the SPA and Noncompetition Agreement.

62.     Ira and Alan Kristel's direct and/or indirect solicitation, recruiting and/or hiring of Cenveo's special and unique employees and other employees, and/or inducing Cenveo's employees to discontinue their relationship with Cenveo, violates the SPA and Noncompetition Agreement.

63.     Ira and Alan Kristel's breaches of their contractual duties have directly and proximately caused substantial damage to Cenveo and its business, resulting in the loss of employees, and other damage to its business and its reputation.

64.     Ira and Alan Kristel's breaches of their contractual duties have directly and proximately caused and will continue to cause Cenveo to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that has been and will be caused to Cenveo and that Cenveo will continue to suffer by the continued acts of Ira and Alan Kristel.

## Count II

### BREACH OF CONTRACT
(against Alan Kristel)

65.     Cenveo incorporates by reference and realleges the allegations contained in paragraphs 1 through 64 above as if fully set forth herein.

66.     On July 17, 2008, Alan Kristel entered into the Employment Agreement whereby he was prohibited for a period of two years from directly or indirectly soliciting, recruiting or hiring Cenveo employees, or inducing them to terminate their employment with Cenveo.

67.     The covenants are enforceable, and reasonable in scope and duration.

68.     Cenveo performed in all material respects all of the terms and conditions of the Employment Agreement.

69.     Alan Kristel's direct and/or indirect solicitation, recruiting and/or hiring of Cenveo's special and unique employees and other employee, and/or inducing them to discontinue their relationship with Cenveo violates the Employment Agreement.

70.     Alan Kristel's breach of his contractual duties has directly and proximately caused substantial damage to Cenveo and its business, including but not limited to damage to its reputation.

71.     Alan Kristel's breach of his contractual duties has directly and proximately caused and will continue to cause Cenveo to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that has been and will be caused to Cenveo and that Cenveo will continue to suffer by the continued acts of Alan Kristel.

## Count III

### BREACH OF FIDUCIARY DUTY
(against Ira and Alan Kristel)

72.     Cenveo incorporates by reference and realleges the allegations contained in paragraphs 1 through 71 above as if fully set forth herein.

73.     By virtue of Ira and Alan Kristel's contractual and employee/consulting relationships with Cenveo, Cenveo reposed trust and confidence in Ira and Alan Kristel to refrain from acting in any manner contrary to Cenveo's interests.

74.     Ira and Alan Kristel undertook such trust and confidence.

75.     By reason of the foregoing, Ira and Alan Kristel owed Cenveo a fiduciary duty and duty of loyalty to act in good faith and in Cenveo's best interest.

76.     Such fiduciary duty and duty of loyalty owed by Ira and Alan Kristel to Cenveo existed throughout their working relationships with Cenveo and survived the termination of those relationships.

77.     Ira and Alan Kristel breached their fiduciary duties and duties of loyalty to Cenveo by engaging in the wrongful activity as described herein, including but not limited to the solicitation and/or hiring of Cenveo's special and unique employees and other employees.

78.     Ira and Alan Kristel's actions were and are willful and malicious and without legal justification or excuse.

79.     Ira and Alan Kristel's breaches of their fiduciary duties and duties of loyalty have directly and proximately caused substantial damage to Cenveo and its business, resulting in the loss of employees, and other damage to its business and its reputation.

80.     Ira and Alan Kristel's breaches of their fiduciary duties and duties of loyalty have directly and proximately caused and will continue to cause Cenveo to suffer great and irreparable

damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that has been and will be caused to Cenveo and that Cenveo will continue to suffer by the continued acts of Ira and Alan Kristel.

**Count IV**

PARTICIPATION IN BREACH OF FIDUCIARY DUTY
(against Diversapack)

81.     Cenveo incorporates by reference and realleges the allegations contained in paragraphs 1 through 80 above as if fully set forth herein.

82.     Diversapack aided and abetted Ira and Alan Kristel's breaches of their fiduciary duties by contributing to and encouraging their tortious activity, including but not limited to their solicitation and hiring of Cenveo's special and unique employees and other employees.

83.     Diversapack's aiding and abetting Ira and Alan Kristel's breaches of their fiduciary duties was intentional and without justification.

84.     Diversapack's participation in the breaches of Ira and Alan Kristel's fiduciary duties has directly and proximately caused substantial damage to Cenveo and its business, resulting in the loss of employees, and other damage to its business and its reputation.

85.     Diversapack's participation in the breaches of Ira and Alan Kristel's fiduciary duties has directly and proximately caused and will continue to cause Cenveo to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that has been and will be caused to Cenveo and that Cenveo will continue to suffer by the continued acts of the Defendants.

21

**Count V**

TORTIOUS INTERFERENCE WITH CONTRACT
(against Diversapack)

86.     Cenveo incorporates by reference and realleges the allegations contained in paragraphs 1 through 85 above as if fully set forth herein.

87.     Cenveo has engaged in mutual and valuable contractual relationships with Ira and Alan Kristel.

88.     Diversapack was aware of those ongoing contractual relationships between Cenveo and Ira and Alan Kristel.

89.     Diversapack intentionally and improperly interfered with Cenveo's contractual relationships with Ira and Alan Kristel, and others, by, among other things, participating in the soliciting and hiring of Cenveo's special and unique employees and other employees.

90.     Diversapack's acts of tortious interference with Cenveo's contractual relationships were without justification and were unlawfully motivated by Diversapack's desire to steal Cenveo's special and unique employees and other employees.

91.     Diversapack's acts of tortious interference with Cenveo's contracts have directly and proximately caused substantial damage to Cenveo and its business, resulting in the loss of special and unique employees and other employees, and other damage to its business and its reputation.

92.     Diversapack's acts of tortious interference with Cenveo's contracts have directly and proximately caused and will continue to cause Cenveo to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that has been and will be caused to Cenveo and that Cenveo will continue to suffer by the continued acts of Diversapack.

22

**Count VI**

TORTIOUS INTERFERENCE WITH EMPLOYMENT RELATIONS
(against all Defendants)

93.    Cenveo incorporates by reference and realleges the allegations contained in paragraphs 1 through 92 above as if fully set forth herein.

94.    Defendants intentionally and improperly interfered with Cenveo's employment relations with its employees.

95.    Defendants carried out these acts of interference by wrongful means, including soliciting and retaining Cenveo's special and unique employees and other employees in contravention of the Kristels' ongoing contractual relationships with Cenveo.

96.    Defendants intentionally interfered with Cenveo's employment relations in an attempt to obtain for itself, *inter alia*, the services of Cenveo's special and unique employees and other employees, and with the intent to cripple Cenveo's business.

97.    Defendants' interference with Cenveo's employment relations has directly and proximately caused Cenveo to suffer damages. If Defendants' actions are permitted to continue, they will cause irreparable harm to Cenveo.

98.    Defendants' conduct was willful and malicious and without legal justification or excuse.

WHEREFORE, Cenveo demands judgment against Diversapack and Ira and Alan Kristel, as follows:

A.     Enjoining Defendants, and their employees, officers, agents, subsidiaries or affiliates from soliciting, recruiting and/or hiring Cenveo employees, and/or inducing them to discontinue their relationship with Cenveo;

B.     Awarding to Cenveo all attorneys' fees, costs and disbursements incurred by it in this action;

C.     Awarding to Cenveo and against Defendants damages in an amount to be determined at trial; and

D.     Granting such other, further and different relief as the Court may deem just and proper.

Dated: New York, New York
       August 28, 2009

HUGHES HUBBARD & REED LLP

By: _____
    Ned H. Bassen
    Jason Habinsky
    Alexander Bogdan
    One Battery Park Plaza
    New York, New York  10004
    (212) 837-6000
    bassen@hugheshubbard.com
    habinsky@hugheshubbard.com
    bogdan@hugheshubbard.com

    Attorneys for Plaintiff
    Cenveo Corporation

60765188_1.DOC

24