HUGHES HUBBARD & REED LLP
Ned H. Bassen
Jason Habinsky
Alexander Bogdan
One Battery Park Plaza
New York, New York 10004
Tel.: (212) 837-6000

Attorneys for Plaintiff
Cenveo Corporation

**JUDGE SCHEINDLIN**

**09 CIV 7544**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CENVEO CORPORATION,

                         Plaintiff,

           -against-

DIVERSAPACK LLC, IRA B. KRISTEL,
AND ALAN J. KRISTEL,

                     Defendants.

---

Case No.:

 

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS.....................................................................................................1

    The Parties .........................................................................................................................1

    The Sale of Commercial Envelope Manufacturing Co., Inc.................................................2

    CEM's Special and Unique Employees...............................................................................3

    The No-Raiding Provisions..................................................................................................7

    The Kristels Join Diversapack .............................................................................................9

    The Defendants' Raiding of CEM Employees ...................................................................10

ARGUMENT...........................................................................................................................17

    I.     THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION.................17

          A.     Irreparable Harm ...............................................................................18

          B.     Likelihood of Success on the Merits....................................................20

               1.     Breach of Contract .......................................................21

               2.     Breach of Fiduciary Duty...............................................26

               3.     Participation in Breach of Fiduciary Duty .....................27

               4.     Tortious Interference With Contract...............................28

               5.     Tortious Interference With Employment Relations.......29

          C.     Balance of Hardships .........................................................................29

CONCLUSION ........................................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Albert v. Loksen*, 239 F.3d 256 (2d Cir. 2001) ............................................................................29

*Bradford v. New York Times Co.*, 501 F.2d 51 (2d Cir. 1974) ................................................23, 25

*Celebrity Serv. Int'l, Inc. v. Celebrity World, Inc.*, No. 86 Civ. 8593, 1988 U.S. Dist. LEXIS 16079 (S.D.N.Y. Apr. 4, 1988) ....................................................................................29

*Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 234 A.D.2d 200 (N.Y. App. Div. 1st Dep't 1996) ..................................................................................................................................22

*Cohen v. Davis*, 926 F. Supp. 399 (S.D.N.Y. 1996) ....................................................................29

*Duane Jones, Co. v. Burke*, 306 N.Y. 172 (1954) ...............................................................26, 27

*Ecolab Inc. v. Paolo*, 753 F. Supp. 1100 (E.D.N.Y. 1991) .........................................................29

*Ecolab v. K.P. Laundry Mach., Inc.*, 656 F. Supp. 894 (S.D.N.Y. 1987) .....................................30

*Frederick Chusid & Co. v. Marshall Leeman & Co.*, 279 F. Supp. 913 (S.D.N.Y. 1968) ......27, 30

*Global Switching Inc. v. Kasper*, No. CV-06-412, 2006 U.S. Dist. LEXIS 44450 (E.D.N.Y. June 29, 2006) ................................................................................................18, 23

*Global Telesystems, Inc. v. KPNQwest, N.V.*, 151 F. Supp. 2d 478 (S.D.N.Y. 2001) ......20, 22, 30

*Good Energy, L.P. v. Kosachuk*, 853 N.Y.S.2d 75 (App. Div. 1st Dep't 2008) ............................23

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007) .................................18

*Hyde Park Prods. Corp. v. Maximilian Lerner Corp.*, 65 N.Y.2d 316 (1985) ..............................21

*IBM v. Papermaster*, No. 08-CV-9078 (KMK), 2008 U.S. Dist. LEXIS 95516 (S.D.N.Y. Nov. 21, 2008) ...............................................................................................18, 20, 24, 30

*Ikon Office Solutions, Inc. v. Usherwood Office Tech., Inc.*, 21 Misc.3d 1144A, 2008 NY Slip Op. 52499U (Sup. Ct. 2008) ............................................................19, 20, 22, 30

*Innovative Networks v. Satellite Airlines Ticketing Ctrs.*, 871 F. Supp. 709 (S.D.N.Y. 1995) ..................................................................................................................................28

*Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67 (2d Cir. 1996) ...................................................18

*Lamdin v. Broadway Surface Adver. Corp.*, 272 N.Y. 133 (1936)................................................26

*Lazer Inc. v. Kesselring*, 13 Misc. 3d 427 (Sup. Ct. Monroe County 2005) ..................................26

*Lusk v. Vill. Of Cold Spring*, 475 F.3d 480 (2d Cir. 2007)..............................................................18

*Maltby v. Harlow Meyer Savage Inc.*, 633 N.Y.S.2d 926 (Sup. Ct. 1995), aff'd, 637
    N.Y.S.2d 110 (1st Dep't 1996)......................................................................................................25

*Marsh USA Inc. v. Karasaki*, 08 Civ. 4195 (JGK), 2008 U.S. Dist. LEXIS 90986
    (S.D.N.Y. Oct. 30, 2008) .........................................................................................................18, 19

*Mathias v. Jacobs*, 167 F. Supp. 2d 606 (S.D.N.Y. 2001)...............................................................21

*Misys Int'l Banking Sys., Inc. v. TwoFour Sys., LLC*, 800 N.Y.S.2d 350, 2004 NY Slip
    Op. 51721U (Sup. Ct. 2004) ........................................................................................................19

*Mohawk Maint. Co. v. Kessler*, 52 N.Y.2d 276 (1981) ...................................................................21

*Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, 07 CV 1562 (ERK) (RML), 2008 U.S.
    Dist. LEXIS 5389 (E.D.N.Y. Jan. 24, 2008) ...............................................................................22

*Natsource LLC v. Paribello*, 151 F. Supp. 2d 465 (S.D.N.Y. 2001) ........................................19, 30

*Payment Alliance Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477 (S.D.N.Y. 2007).....................21, 22

*Purchasing Assocs., Inc. v. Weitz*, 13 N.Y.2d 267 (1963) ...............................................................21

*S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843 (2d Cir. 1987) ......................................................27, 28

*Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63 (2d Cir. 1999)..................................................20, 22, 24

*Uniform Rental Div., Inc. v. Moreno*, 441 N.Y.S.2d 538 (App. Div. 2d Dep't 1981)...................25

*Veraldi v. Am. Analytical Labs, Inc.*, 271 A.D.2d 599 (N.Y. App. Div. 2d Dep't 2000)..............22

*W. Elec. Co. v. Brenner*, 41 N.Y.2d 291 (1977) .............................................................................26

*Whitney v. Citibank, N.A.*, 782 F.2d 1106 (2d Cir. 1986)................................................................27

This memorandum of law is submitted on behalf of Plaintiff Cenveo Corporation ("Cenveo") in support of its order to show cause for a preliminary injunction against Diversapack LLC ("Diversapack"), Ira B. Kristel, and Alan J. Kristel (collectively, "Defendants"). Cenveo respectfully requests that the Court enjoin Defendants and their employees, officers, agents, subsidiaries or affiliates from continuing to solicit, recruit and/or hire Cenveo's employees, and/or continue to induce Cenveo's employees to discontinue their relationships with Cenveo.

## PRELIMINARY STATEMENT

Cenveo makes this application for injunctive relief in an attempt to halt Defendants' unlawful scheme to raid uniquely skilled critical employees of Cenveo's Commercial Envelope Manufacturing Co., Inc. ("CEM"), a company that members of the Kristel family, which includes Ira, Alan, Steven and Mindy (collectively, "the Kristels"), had sold to Cenveo. Ira and Alan Kristel have cherry-picked CEM's uniquely skilled critical employees to work at their new company, Diversapack, and in particular at a new facility they are opening. They did so despite, and in violation of a number of covenants they had contracted to that prohibit them from raiding these employees. As a result, Cenveo has suffered and will continue to suffer irreparable harm.

## STATEMENT OF FACTS

The Parties

Cenveo provides print and visual communications products and services, including commercial print services, creative services, envelopes, forms and labels, mailing services, and packaging to a variety of clients, with its principal place of business in Stamford, Connecticut.

(Stangroom Decl. ¶ 2.)[1] Diversapack LLC ("Diversapack") is a packaging company with its principal place of business in Atlanta, Georgia. (Compl. ¶ 5.) Ira B. Kristel is an owner and executive of Diversapack, and a resident of New York. (Compl. ¶ 6.) Alan J. Kristel is an owner and executive of Diversapack, and a resident of New York. (Compl. ¶ 7.)

The Sale of Commercial Envelope Manufacturing Co., Inc.

Members of the Kristel family founded and owned all outstanding shares of CEM, a company that manufactures premium, industry-standard envelopes on various paper materials with a wide variety of types and seals, and provides creative direct mail services to large corporate clients including manufacturers of popular consumer goods, multinational banks, insurance companies, and telecommunications companies. (Compl. ¶ 8.) On July 17, 2007, the Kristels entered into a Stock Purchase Agreement ("SPA") with Cenveo whereby the Kristels sold all of the capital stock of CEM to Cenveo for approximately $230 million, of which a portion was used to repay CEM's debt. (Compl. ¶ 9, Ex. A.) In connection with the purchase, Cenveo also agreed to continue to retain the Kristels in important high-level positions pursuant to employment agreements (the "Employment Agreements") dated July 17, 2007. (Compl. ¶ 10, Ex. B.) Ira and Mindy also entered into noncompetition agreements with Cenveo dated July 17, 2007 (the "Noncompetition Agreements"). (Compl. ¶ 10, Ex. C.) Specifically, the Kristels were retained in the following capacities: Ira - Consultant; Alan - Senior Vice President of Manufacturing; Steven - Senior Vice President and General Manager - Eastern Region; and Mindy - Director Sales and Marketing. (Compl. ¶ 10, Ex. B.) The purchase transaction closed on August 30, 2007. (Compl. ¶ 11, Ex. A § 1.2.)

---

1.  References to "Stangroom Decl." refer to the Declaration of William Stangroom, dated August 27, 2009, submitted herewith in support of Cenveo's Order to Show Cause for a Preliminary Injunction.

<u>CEM's Special and Unique Employees</u>

CEM's management-level positions include General Manager, Plant Manager, Plant Supervisor, and Sales Manager (collectively, "the Managers"). (Stangroom Decl. ¶ 5, Ball Aff. ¶ 5.)[2] CEM's Managers oversee the plants' finances and production operations. (Stangroom Decl. ¶ 5, Ball Aff. ¶ 6.) Their services are special and unique because of the small universe of managers who can simultaneously: (1) understand, anticipate, and meet CEM's clients' tailored and specific needs; (2) run the operations of a sophisticated plant; and, most importantly, (3) understand and coordinate the hypertechnical aspects of production for a company that is constantly incorporating new, cutting-edge machines and methods to serve major corporate clients. (*Id.*)

CEM's Adjuster positions include A-level, B-level, and C-level Adjusters (collectively "the Adjusters"). (Ball Aff. ¶ 7.) A-level Adjusters set up, troubleshoot, and adjust for size, shape, and other custom specifications multiple types of sophisticated, CEM-modified machines. (Stangroom Decl. ¶ 6, Ball Aff. ¶ 8.) These machines include Cerutti presses at CEM's Altoona, Pennsylvania plant. (Ball Aff. ¶ 8.) Cerutti presses are unique, high-end, Italian-manufactured machines requiring years of experience to master the setting up, troubleshooting and adjustment of such machines. (Ball Aff. ¶ 8.) Upon information and belief, no other envelope company uses Cerutti presses on the front end of the business as CEM does. (*Id.*) CEM generally requires an Adjuster to spend at least five years training on the job to qualify as an A-level Adjuster. (Stangroom Decl. ¶ 6, Ball Aff. ¶ 8.)

B-level Adjusters set up, adjust for size, shape, and other custom specifications, and occasionally troubleshoot one to two types of sophisticated, CEM-specific machines. (Ball Aff.

---

2.  References to "Ball Aff." refer to the Affidavit of Francis Ball, dated August 27, 2009, submitted herewith in support of Cenveo's Order to Show Cause for a Preliminary Injunction.

¶ 9.) CEM generally requires an Adjuster to spend up to three years training on the job to qualify as a B-level Adjuster. (*Id.*) One distinction between A- and B-level Adjusters is the ability to troubleshoot. (Stangroom Decl. ¶ 6, Ball Aff. ¶ 9.) For example, an Adjuster must detect whether a poly patch is either pulling back or wrinkling. (Ball Aff. ¶ 9.) An A-level Adjuster is much more likely to detect such a problem, and be familiar with the necessary adjustment techniques, than is a B-level Adjuster. (*Id.*)

C-level Adjusters are trainees that are paired up with more advanced Adjusters. (Ball Aff. ¶ 10.) They are occasionally able to operate one type of sophisticated, CEM-specific machine. (*Id.*) CEM generally requires a C-level Adjuster to spend up to a year training on the job before being considered for advancement to a B-level position. (*Id.*) Each day that a more advanced Adjuster spends training a C-level Adjustor costs the more advanced Adjuster, and CEM, large, substantial investments in training time and resources. (*Id.*)

Regardless of level, each Adjuster's services are special and unique because of the Adjusters' unusual knowledge required to run the Cerutti press, their ability to operate Company-specific, specially-modified printing equipment, and the experience required to follow work orders properly and constantly adjust CEM's sophisticated equipment in accordance with CEM's rigorous standards. (Ball Aff. ¶ 11.) In addition to learning how to operate the Cerutti press, it takes years for CEM Adjustors to become familiar with the other complicated machines CEM uses, which include W&D202s, W&D399s, and Smithe SWs. (Stangroom Decl. ¶ 6, Ball Aff. ¶ 11.) Moreover, the machine setup process is critical and requires special training. (Ball Aff. ¶ 11.) Setup includes the placement of knives and panel-cutters which, if incorrectly placed, can cause machine damage requiring large sums of time and money for repair. (*Id.*) Finally, Adjusters are special and unique as a result of CEM's special and unique printing methods -

4

much of CEM's printing is high-end, process color flexo-printing. (*Id.*) It takes Adjusters years to familiarize themselves with the components of this process - from the anilox rollers which come in different line screens and cell densities, to identifying screens or tints in the artwork, to understanding how any of these components affects the color of the art. (*Id.*)

CEM's Graphics Department positions include Graphics Lead and Graphic Artist (collectively "the Graphics employees"). (Ball Aff. ¶ 12.) The Graphics employees make envelope art and work with clients to manipulate clients' proposed art to be compatible with envelope specifications and sophisticated, CEM-specific equipment. (Ball Aff. ¶ 13.) Their services are special and unique because not only must they be extremely talented in their field, they also must learn how to make envelope art compatible with sophisticated, CEM-specific equipment. (*Id.*) Like the Adjusters, the Graphics employees must be able to detect screens and tints, and understand how they affect the color of the art. (*Id.*)

The Graphics Lead is special and unique because a very small universe of Graphics professionals can look at a printed piece and determine how to change the screen dots to affect the color in the final print. (Ball Aff. ¶ 14.) Similarly, the Graphic Artists must familiarize themselves with screen dots and their effect on the color in the final print. (Ball Aff. ¶ 15.) While the Graphics Lead, by virtue of longer experience with CEM, can ordinarily execute this process on the first, second, or third attempt, the Graphic Artists ordinarily require several attempts even with their well-trained eyes. (*Id.*) Additionally, the Graphics Lead and Graphic Artists are special and unique because of their fluency with regard to an unusual number of complicated, cutting-edge software products, including Adobe Illustrator and Quark Express. (Ball Aff. ¶ 16.) CEM trains the Graphics Lead and Graphic Artists to use these programs in-house. (*Id.*)

CEM's Sales Managers and Sales Representatives (collectively, "the Sales employees") form and develop relationships with clients and present CEM's sophisticated services at a highly technical level. (Stangroom Decl. ¶ 7.) Their services are special and unique because it is exceedingly difficult to find Sales employees who understand and effectively communicate to Cenveo's clients the details, capabilities, and limitations of Cenveo's sophisticated production process. (*Id.*) This is especially true in the case of selling the high-level flexology plate services available at the CEM Altoona plant. (*Id.*) Each CEM Sales employee works with CEM for several years before attaining the requisite level of knowledge and communication skills that are specific to CEM's services. (*Id.*)

CEM's Schedulers perform the critical role of scheduling the positioning and sequencing of production. (Stangroom Decl. ¶ 8.) The Scheduler ensures that CEM maximizes productivity and efficiency by running various orders on the correct machines at the right sequence. (*Id.*) The Scheduler must know the print capabilities of each type of machine, assess and anticipate whether the order is a short-run or long-run order, and gang runs on machines using certain sizes and equipment. (*Id.*) Several years of experience working with CEM, and a very high level of knowledge about the technical aspects of CEM's production, are required to do this job. (*Id.*)

CEM also employs a highly-trained Electronics Expert. (Stangroom Decl. ¶ 9, Ball Aff. 17.) The Electronics Expert performs electronic diagnostics, repairs, modifications and upgrades on sophisticated, cutting-edge, CEM-specific machines. (*Id.*) In addition, the Electronic Experts must be fluent in programming Programmable Logic Controllers ("PLCs"). (Ball Aff. ¶ 17.) Accordingly, the Electronic Expert performs services that are special, unique, and require a skill set rare in this industry. (Stangroom Decl. ¶ 9, Ball Aff. 17.)

CEM also employs an Electrician. (Stangroom Decl. ¶ 10.) The Electrician assists the Electronics Expert in performing electronic diagnostics, repairs, modifications, and upgrades on sophisticated, cutting-edge CEM-specific machines. (*Id.*) The Electrician also must work quickly to fix electrical and other technical problems with CEM's systems and machines. (*Id.*) It takes several years of on-the-job training for the Electrician to perform these tasks effectively. (*Id.*) Without the Electrician, CEM is less able to avail itself of the sophisticated, cutting edge machines that help makes CEM's products the industry standard. (*Id.*)

The No-Raiding Provisions

By virtue of the fact that members of the Kristel family had been the founders and owners of CEM and would continue to provide services to CEM in high-ranking positions, they had and continued to have access to CEM's highly confidential information and trade secrets. (Compl. ¶ 28.) The Kristels also had and continue to have detailed personal knowledge of the services provided by CEM's employees and, in particular, knew the identity of the uniquely skilled critical employees. (*Id.*) CEM's most valuable and unique employees were and continue to be critical to CEM's business and are extremely difficult to replace. (Stangroom Decl. ¶ 23, Ball Aff. ¶ 34, Compl. ¶ 28.) Accordingly, as essential consideration for Cenveo's purchase of CEM's stock, Cenveo required specific restrictions in SPA, Noncompetition Agreements, and Employment Agreements that prohibit the Kristels from raiding CEM's employees as they have now done. (Compl. ¶ 28) Cenveo would not have entered into the purchase transaction without the restrictions prohibiting the Kristels from such raiding. (Compl. ¶ 28, Ex. A § 6.7(e).) To protect itself, Cenveo negotiated and obtained covenants in the SPA, Noncompetition Agreements and Employment Agreements that prohibit the Kristels (the "Stockholders") from raiding CEM's (the "Company") or Cenveo's (the "Buyer") employees. (Compl. ¶ 28.)

Section 6.7(b) of the SPA provides that:

> If the Closing occurs for a period of 60 months beginning on the Closing Date, no Stockholder will, and each Stockholder will cause his, her or its Affiliates not to directly or indirectly, . . . (iv) otherwise engage or participate in any effort or act to induce any Person to discontinue a relationship with the Company or its Subsidiaries or Buyer or any of its Affiliates.

(Compl. Ex. A § 6.7(b).) Section 6.7(e) of the SPA further provides:

> The parties acknowledge and agree that the restrictions . . . are a reasonable and necessary protection of the immediate interests of Buyer, and any violation of these restrictions would cause substantial injury to Buyer and that Buyer would not have entered into this Agreement and the other Transaction Documents without receiving the additional consideration offered by the Stockholders in binding themselves to these restrictions. In the event of a breach or a threatened breach by the Stockholders or any Affiliate of the Stockholders of these restrictions, Buyer will be entitled to an injunction restraining the Stockholders or their Affiliates, as applicable, from such breach or threatened breach (without the necessity of proving the inadequacy as a remedy of money damages or the posting of a bond); provided, however, that the right to injunctive relief will not be construed as prohibiting Buyer from pursuing any other available remedies, whether at law or in equity, for such breach or threatened breach.

(Compl. Ex. A § 6.7(e).) The Noncompetition Agreements contain provisions identical to those

contained in Section 6.7 of the SPA. (Compl. ¶ 31, Ex. A §§ 6.7(b) and (e), Ex. C. §§ 1.1(b) and

(e).)

Alan Kristel's Employment Agreement provides in Section 6(b) that:

> At all times during your employment with the Company and for a period of two years after the date of the termination of your employment with the Company, you will not, directly or indirectly: (i) solicit for employment, recruit or hire, either as an employee or a consultant, any employee, consultant or independent contractor of any Company Entity who was an employee, consultant or independent contractor of any Company Entity as of the date of this Agreement or at any time during the 12 months prior to your termination of employment; (ii) induce or attempt to induce any employee, consultant or independent contractor of any Company Entity who was an employee, consultant or independent contractor

8

of any Company Entity as of the date of this Agreement or at any time during the 12 months prior to your termination of employment to terminate his or her employment with, or otherwise cease his or her relationship with, the Company. . . .

(Compl. Ex. B § 6(b).)  The Employment Agreement further provides in Section 6(d):

You acknowledge and agree that the restrictions contained in Sections 6(a), (b) and (c) are a reasonable and necessary protection of the immediate interests of the Company, and any violation of these restrictions would cause substantial injury to the Company and that the Company would not have entered into this Agreement without receiving the protective covenants contained in Sections 6(a), (b) and (c).  In the event of a breach or a threatened breach by you or any of your affiliates of these restrictions, the Company will be entitled to an injunction restraining you or such affiliate, as applicable, from such breach or threatened breach (without the necessity of proving the inadequacy as a remedy of money damages or the posting of a bond); provided, however, that the right to injunctive relief will not be construed as prohibiting the Company from pursuing any other available remedies, whether at law or in equity, for such breach or threatened breach. If, at the time of enforcement of this Section 6, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope, area or other restrictions reasonable under such circumstances shall be substituted for the stated duration, scope, area or other restrictions.

(Compl. Ex. B § 6(d).)

The Kristels Join Diversapack

In December 2007, Ira Kristel ceased working for Cenveo, and in February 2008 the remaining Kristels also terminated their employment with Cenveo. (Stangroom Decl. ¶ 11, Ball Aff. ¶ 18.)  Shortly thereafter, Ira and Alan Kristel informed Cenveo that they had purchased a substantial ownership in Diversapack, a packaging company. (Stangroom Decl. ¶ 12, Ball Aff. ¶ 19.)  Based upon the information the Kristels provided to Cenveo, the parties agreed by Letter Agreement dated May 30, 2008 (the "Letter Agreement"), that the Kristels would not be in violation of Section 6.7(a) of the SPA and Noncompetition agreements "solely by virtue of their

9

ownership of, or rendering of services to, a business that manufactures polymer-based flexible films used in the packaging industry." (Compl. ¶ 35, Ex. D ¶ 6.) However, Cenveo did not agree to excuse the Kristels from their non-solicitation/non-hire of employees restrictions contained in Section 6.7(b) of the SPA or Noncompetition Agreements, or Section 6(b) of the Employment Agreements. (*Id.*) Accordingly, the Kristels continued to be bound by such non-solicitation/non-hire provisions. (Compl. ¶ 35.)

The Defendants' Raiding of CEM Employees

Cenveo thereafter learned that Diversapack was opening a facility in Altoona, Pennsylvania, the same city where CEM's Altoona facility was located. (Compl. ¶ 36.) Although Diversapack does not presently compete directly for the same customers as CEM, Diversapack is installing Cerutti presses that are substantially similar to those used by CEM. (Stangroom Decl. ¶ 12, Ball Aff. ¶ 19.) In essence, the choices are that Diversapack either will be running plastic packaging strata through their machines while CEM is running paper through CEM's machines or Diversapack will be competing directly with CEM. (Ball Aff. ¶ 19.) Under either choice, the skills needed to operate both Diversapack's and CEM's Cerutti machines are virtually identical. (*Id.*)

Because of their detailed knowledge of the uniquely skilled and critical CEM employees, the Kristels had the inside information needed to enable them to cherry-pick CEM's most valuable employees to work at Diversapack and cripple Cenveo's business, which is exactly what the Defendants have done despite, and in violation of, the contractual provisions prohibiting them from doing so. (Compl. ¶ 37.) Effective May 2, 2008, John Knoesel, a companywide Sales Representative, resigned from his employment with CEM. (Stangroom Decl. ¶ 15.) Mr. Knoesel informed Cenveo Regional Vice President William Stangroom at a

recent dinner that he is presently employed by Diversapack. (*Id.*) CEM lost unique and special services with Mr. Knoesel's departure, because it is exceedingly difficult to find Sales employees who understand and effectively communicate to CEM's clients the details, capabilities, and limitations of CEM's sophisticated production process. (*Id.*) Mr. Knoesel acquired these abilities over ten years of employment with CEM. (*Id.*) Accordingly, Mr. Knoesel has been very difficult to replace. (*Id.*)

Effective June 22, 2008, Altoona CEM Plant Manager Jerry Salafrio resigned his employment with CEM. (Ball Aff. ¶ 22.) Cenveo was told shortly thereafter by an adhesives supplier that Mr. Salafario was seen working for Diversapack in its California office. (*Id.*) An Altoona CEM Plant employee recently saw Mr. Salafrio in Altoona. (*Id.*) Mr. Salafrio's services were special and unique because it is exceedingly difficult to find a manager, like him, who can at the same time understand, anticipate, and meet the clients' needs, run the operations of a sophisticated plant, and understand and coordinate the hypertechnical aspects of production for a company that is constantly incorporating new, cutting-edge machines and methods. (*Id.*)

Effective October 3, 2008 Altoona CEM Plant Graphics Lead Chad Wilt resigned his employment with CEM. (Ball Aff. ¶ 23.) A vendor thereafter informed Cenveo that the Kristels aided Mr. Wilt in setting up his own business and subsequently employed him at Diversapack. (*Id.*) Diversapack's online newsletter confirms that Mr. Wilt was hired by Diversapack effective January 5, 2009. (*Id.*) Mr. Wilt was the only employee at CEM's Altoona facility able to look at a printed piece and determine how to change the screen dots to affect the color in a final print in relatively few attempts, and was highly fluent in the sophisticated, cutting edge graphics software programs used at CEM that require constant practice and training. (*Id.*)

11

Effective October 31, 2008, CEM Sales Managers Bob Gerardo and Ed Riguardi separated from their employment with CEM. (Stangroom Decl. ¶ 16.) Prior to their separation, Mr. Gerardo and Mr. Riguardi began to complain vigorously about various aspects of their employment. (*Id.*) Upon information and belief, they began complaining once they had already secured an offer of employment with Diversapack. (*Id.*) Mr. Gerardo's and Mr. Riguardi's employment with Diversapack commenced soon after their separation. (*Id.*) Diversapack's website confirms that they presently work for Diversapack ("For all inquiries, please contact: Bob Gerardo and Ed Riguardi"). (*Id.*) With the simultaneous departure of Mr. Gerardo and Mr. Riguardi, CEM lost unique and special services because the Sales Mangers had formed and developed strong relationships with clients and were uniquely able to present our sophisticated services at a highly technical level. (*Id.*) It is exceedingly difficult to find Sales employees who understand and effectively communicate to CEM's clients the details, capabilities, and limitations, of our sophisticated production process. (*Id.*) This is especially true in the case of selling the high-level flexology plate services available at CEM's Altoona plant. (*Id.*)

Effective March 20, 2009, Daniel Moran, the Plant Manager for the Carlstadt facility, resigned from his employment with CEM. (Stangroom Decl. ¶ 17.) On information and belief, Mr. Moran is presently employed by Diversapack. (*Id.*) CEM lost the special and unique services rendered by Mr. Moran as he drew on twenty-seven years of experience with the company to understand, anticipate, and meet CEM's clients' needs, run the operations of the sophisticated Carlstadt plant, and, most importantly, coordinate the hypertechnical aspects of production for a company that is constantly incorporating new, cutting-edge machines and methods to serve major corporate clients. (*Id.*)

12

The Kristels invited a large group of Altoona-based CEM employees to a party in New York, New York on April 18, 2009. (Ball Aff. ¶ 25.) Among the CEM employees attending this party was Bryan Harper, who was then employed as an A-level Adjuster at CEM's Altoona facility. (*Id.*) At this party, the Kristels informed the CEM employees in attendance of their plans to open a large, specialized Diversapack printing plant with approximately 150-180 employees in Altoona. (Ball Aff. ¶ 26.) The Kristels also made false statements at this party to the CEM employees regarding CEM's financial state. (Ball Aff. ¶ 27.) The Kristels further told the CEM employees at the party that the Kristels were opening a Diversapack plant in Altoona not as a business opportunity for the Kristels or Diversapack, but rather as a service to the Altoona-based CEM employees, whom the Kristels considered "family." (*Id.*)

Effective June 19, 2009, Bob Monohan, an A-level Adjuster at CEM's Jersey City, New Jersey plant, resigned from his employment with CEM. (Stangroom Decl. ¶ 18.) Mr. Monohan told the Company he was leaving to pursue a career in carpentry. (*Id.*) In August 2009, an Adjuster in the Jersey City plant learned that Mr. Monohan is presently employed by Diversapack. (*Id.*) Mr. Monahan's special and unique services, the result of his skills and 29 years of on-the-job training with CEM, included his extraordinary ability to set up, troubleshoot, and adjust for size, shape, and other custom specifications the complicated Smithe SW machine. (*Id.*) It is extremely difficult to find an Adjuster whose technical skills and extensive experience compare to those of Mr. Monohan. (*Id.*)

Effective June 26, 2009, Cirilo Sanchez, an Electrician at CEM's Jersey City plant, resigned from his employment with CEM. (Stangroom Decl. ¶ 19.) On information and belief, Mr. Sanchez is presently employed by Diversapack. (*Id.*) CEM has lost the unique and special services provided by Mr. Sanchez, who assisted the Electronics Expert in performing electronic

13

diagnostics, repairs, modifications and upgrades on sophisticated, cutting-edge, CEM-specific machines. (*Id.*) CEM has also lost Mr. Sanchez's unique and special ability to fix quickly electrical and other technical problems with CEM's systems and machines. (*Id.*) Mr. Sanchez attained this ability over his eleven years with CEM. (*Id.*) Without him, CEM is less able to maximize the productivity made possible by CEM's sophisticated, cutting edge machines. (*Id.*)

As the evidence continued to mount, Cenveo had ample reason to believe that Ira and Alan Kristel had raided critical uniquely skilled CEM employees to work for Diversapack. (Compl. ¶ 47.) Accordingly, on June 24, 2009, Cenveo's General Counsel Timothy Davis, Esq. wrote a letter to Alan Kristel stating:

> I am writing to you regarding the recent hiring by Diversapack LLC ("Diversapack") of employees of Cenveo Corporation (the "Company").
>
> I refer you to your employment agreement with the Company dated July 17, 2007, a copy of which is attached. As you'll note, such agreement prohibits you from, among other things, soliciting, recruiting or <u>hiring</u>, directly or indirectly, employees of the Company. Such restriction runs through February 29, 2010. Because you are an investor in and senior manager of Diversapack, we believe the restriction prohibits Diversapack from hiring such employees during the restricted period.
>
> We hereby demand that you cease and desist from such solicitations and/or hirings and comply with the terms of your agreement. We also demand that you compensate us for the damage that we have suffered by your actions.
>
> We expect that you will comply fully with all of your obligations. Of course, if you do not comply with your obligations, we intend to enforce vigorously our legal rights and hold you personally responsible for any damages that we suffer by reason of your actions.

(Compl. Ex. E.)

The Kristels' attorney, William Wachtel, Esq. responded by letter dated July 1, 2009, arguing that the Letter Agreement somehow permitted the Kristels and Diversapack to hire Cenveo's employees. (Compl. ¶ 48.) However, Attorney Wachtel failed to consider that the Letter Agreement did not change the non-raiding provisions contained in the SPA and Noncompetition Agreements and he completely forgot about the non-raiding restrictions in the Employment Agreements, all which remained in full force and effect. (*Id.*)

The next day, Cenveo General Counsel Davis responded on behalf of Cenveo, stating:

> As I told you, the non-solicitation/non-hire provisions of both the Stock Purchase Agreement and the Employment Agreements prohibit Alan and Steven from soliciting, recruiting or hiring Cenveo employees for any company they are associated with, whether or not it is a competing company. The May 30, 2008 Letter Agreement only acknowledged that their interest in Diversapack was not a breach of Section 6.7(a) and did not address the non-solicitation/non-hire provisions of 6.7(b), which remain in force. It also appears that the extent of their soliciting/recruiting/hiring and their apparent plan to build a facility close to the facility that they sold us in Altoona, Penn. Constitutes corporate raiding.

(Compl. Ex. F.)

Notwithstanding these letters, and several subsequent communications with Attorney Wachtel, Ira and Alan Kristel have continued to raid CEM's uniquely skilled critical employees. (Compl. ¶ 50.) For example, in July and August 2009, Bryan Harber, Rodger White, and Mike McKnight, three highly trained Adjusters from CEM's Altoona plant, resigned their employment. (Ball Aff. ¶¶ 29, 30, 31.) On information and belief, these former CEM employees are now employed by the Kristels and Diversapack or will be employed by the Kristels and Diversapack in the near future. (*Id.*) Mr. Harber attended the Kristels' April 2009 party in New York. (Ball Aff. ¶ 25.) All of these employees provided unique and special services to CEM. (Ball Aff. ¶¶ 29, 30, 31.) Messrs. Harber and White were A-level Adjusters at

the CEM Altoona plant. (Ball Aff. ¶¶ 29, 30.) Mr. McKnight was a B-level Adjuster at CEM's Altoona plant. (Ball Aff. ¶ 31.) To date, CEM has been unable to fill the Adjuster positions vacated by Messrs. Harber, White and McKnight. (Compl. ¶ 52.)

CEM Altoona Electronics Expert Jim Miller resigned his employment with CEM, effective July 2, 2009. (Ball Aff. ¶ 28.) In response to a question from Altoona General Manager Frank Ball as to where Mr. Miller would be going to work, Mr. Miller responded that "he wanted to try something else." (*Id.*) Shortly thereafter, a telephone systems vendor informed Mr. Ball that Mr. Miller had ordered a telephone system for Diversapack's planned Altoona facility. (*Id.*) Mr. Miller provided CEM with special and unique services. (*Id.*) Production at the CEM Altoona facility has suffered in the absence of Mr. Miller's special and unique ability to program logic controllers and to perform electronic diagnostics, repairs, modifications and upgrades on sophisticated, cutting-edge CEM-specific machines. (*Id.*) Without Mr. Miller's special and unique services, CEM is far less able to avail itself of the sophisticated, cutting-edge machines that make CEM's products the industry standard. (*Id.*)

Effective August 28, 2009, Jersey City Plant Scheduler David Osborn resigned from his employment with CEM. (Stangroom Decl. ¶ 21.) On information and belief, Mr. Osborn is leaving to work for Diversapack. (*Id.*) With Mr. Osborn's departure, CEM is losing his unique and special services in scheduling efficiently the positioning and sequence of production in the Jersey City plant. (*Id.*) Over the course of his 22 years with CEM, Mr. Osborn developed the ability to maximize productivity and efficiency by running various orders on the correct machines at the right sequence. (*Id.*) Mr. Osborn understood at a high level of technicality the print capabilities of each type of machine, and was keenly able to assess and anticipate whether

16

each order was short-run or long-run. (*Id.*) He also developed a strong ability to gang runs on machines using various sizes and equipment. (*Id.*)

In attempting to replace the CEM employees Defendants have raided, Cenveo has paid for and posted recruitment advertisements on several search websites including Monster.com and CareerBuilder.com, and in newspapers, and taken other actions. (Stangroom Decl. ¶ 22, Ball Aff. ¶ 32.) Not surprisingly, Cenveo has been unable to find replacements for the uniquely skilled critical employees whom Defendants have raided. (*Id.*) This is because these employees are so uniquely specialized that they are extremely difficult to replace. (*Id.*)

Defendants' raiding of Cenveo's employees has caused substantial and irreparable harm. By way of example, as of June 2009, the Altoona CEM Plant was producing an average of 12.5 million envelopes per day. (Ball Aff. ¶ 33.) As a result of the departure of these critical uniquely skilled employees to Diversapack this summer, the Altoona CEM Plant is now capable of producing only an average of 9 million envelopes per day, resulting in substantial losses that will continue to magnify. (*Id.*)

The ongoing exodus of CEM employees leaving to work for Diversapack has had an utterly destabilizing effect on Cenveo's CEM. (Stangroom Decl. ¶ 23, Ball ¶ 34.) Their departures continue to seriously damage CEM's productivity, cohesion, and morale, in addition to the fact that uniquely skilled critical employees have proven extremely difficult to replace. (*Id.*) Cenveo has suffered and will continue to suffer immeasurably. (*Id.*)

## ARGUMENT

## I. THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION

Only a preliminary injunction will prevent the significant irreparable commercial injury to Cenveo that will occur should Defendants be allowed to continue to raid CEM's uniquely skilled critical employees. A party seeking a preliminary injunction must show: "(1) that [it]

17

will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor." *IBM v. Papermaster*, No. 08-CV-9078 (KMK), 2008 U.S. Dist. LEXIS 95516, at *19 (S.D.N.Y. Nov. 21, 2008) (quoting *Lusk v. Vill. Of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007)). Cenveo can satisfy each of these factors.

## A. Irreparable Harm

Cenveo will be irreparably harmed if this Court does not issue a preliminary injunction. To show that it will be irreparably harmed, a plaintiff must show that it will suffer an injury that is "neither remote nor speculative, but actual and imminent" and that a "monetary reward cannot be adequate compensation." *Marsh USA Inc. v. Karasaki*, 08 Civ. 4195 (JGK), 2008 U.S. Dist. LEXIS 90986, at *39-40 (S.D.N.Y. Oct. 30, 2008) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) and *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996)).

It is well established that an employer suffers irreparable harm as a result of unlawful raiding violation of a restrictive covenant as here. *See, e.g.*, *Global Switching Inc. v. Kasper*, No. CV-06-412 (CPS), 2006 U.S. Dist. LEXIS 44450, at *37 (E.D.N.Y. June 29, 2006) ("Just as the violation of a non-compete in the solicitation of customers constitutes irreparable harm, the violation of a non-compete by the solicitation of employees also constitutes irreparable harm"); *Marsh USA*, 2008 U.S. Dist. LEXIS 90986, at *43 ("the loss of [plaintiff's] employees also constitutes irreparable harm"). The loss of these uniquely skilled critical employees has caused and will cause Cenveo to suffer irreparable harm through, *inter alia*, the loss of Cenveo's investment in these unique employees' training and development. *Marsh USA*, 2008 U.S. Dist. LEXIS 90986, at *43. "The loss of training and interference with already established

18

relationships that would occur should [Defendants] recruit other employees . . . are unquantifiable assets" that support a finding of irreparable harm. *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001); *see also Misys Int'l Banking Sys., Inc. v. TwoFour Sys., LLC*, 800 N.Y.S.2d 350, 2004 NY Slip Op. 51721U, at *9 (Sup. Ct. 2004) (finding that plaintiff would suffer irreparable injury where a former employee participated in the solicitation of plaintiff's employees in violation of a non-solicitation covenant). "[A]n award of money damages is unlikely to make plaintiff whole if its current or former employees assist a competitor in hiring away key personnel." *Ikon Office Solutions, Inc. v. Usherwood Office Tech., Inc.*, 21 Misc.3d 1144A, 2008 NY Slip Op. 52499U (Sup. Ct. 2008).

Cenveo already has lost due to the unlawful raiding here a number of critical employees who, as discussed *supra* and in the Ball Aff. and Stangroom Decl., were uniquely skilled and provided valuable services to CEM that will be extremely difficult to replace. Diversapack and the Kristels knew that these employees had a unique and vital role in the operation of CEM's facilities, including its Altoona plant and knew or should have known that Cenveo would be irreparably harmed if they raided these employees from CEM. (Stangroom Decl. ¶ 14, Ball Aff. ¶ 21.)

Indeed, Ira and Alan Kristel agreed that Cenveo would not have an adequate remedy at law for money damages in the event that they breached their non-raiding covenants. The SPA, Ira Kristel's Noncompetition Agreement, and Alan Kristel's Employment Agreement each contain provisions in which Ira and Alan Kristel agree that injunctive relief would be appropriate in the event that Ira or Alan Kristel breached their non-raiding restrictive covenants. (Compl. Ex. A §§ 6.7(e) and 11.11, Compl. Ex. C §§ 1.10(e) and 3.10; Compl. Ex. B § 6(d).) Ira and Alan Kristel explicitly agreed that Cenveo would be entitled to injunctive relief "without the

necessity of proving the inadequacy as a remedy of money damages or the posting of a bond."

(SPA § 6.7(e).) Clauses such as these are recognized as strong evidence in support of a finding

that a plaintiff will suffer irreparable harm in the absence of injunctive relief. *See, e.g., IBM,*

2008 U.S. Dist. LEXIS 95516, at *30 (finding that a similar clause was evidence that the plaintiff

would suffer irreparable harm); *Global Telesystems, Inc. v. KPNQwest, N.V.*, 151 F. Supp. 2d

478, 482 (S.D.N.Y. 2001) (same); *Ikon Office Solutions*, 2008 N.Y. Slip Op. 52499U, at *49

("The Court's finding of irreparable harm is reinforced by the employment agreements signed by

the individual defendants, which acknowledge that a violation of the post-employment covenants

would irreparably harm IKON and consent to the entry of injunctive relief on that basis."). Such

clauses "might arguably be viewed as an admission by [the employee] that plaintiff will suffer

irreparable harm were he to breach the contract . . . . " *Ticor Title Ins. Co. v. Cohen*, 173 F.3d

63, 69 (2d Cir. 1999).

Absent the requested injunctive relief, Cenveo will continue to lose the valuable and

unique services CEM's former employees provided and risk the imminent threat of losing even

more unique and valuable employees. Thus, Cenveo will be irreparably harmed absent a

preliminary injunction.

### B.     Likelihood of Success on the Merits

Cenveo has brought claims (1) for Breach of Contract against the Kristels; (2) for Breach

of Fiduciary Duty against the Kristels; (3) for Participation in Breach of Fiduciary Duty against

Diversapack; (4) for Tortious Interference with Contract against Diversapack; and (5) for

Tortious Interference with Employment Relations against Defendants. Cenveo is likely to

succeed on the merits of each of these claims and is thus entitled to injunctive relief.

## 1.    Breach of Contract

Ira and Alan Kristel unequivocally breached the non-raiding covenants contained in the

SPA, the Noncompetition Agreement, and the Employment Agreements (collectively, the

"Agreements"). Each of the Agreements were entered into in connection with the sale of CEM

to Cenveo. (Compl. ¶¶ 9, 10.) "Courts generally enforce covenants ancillary to a sale of

business." *Payment Alliance Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 483 (S.D.N.Y. 2007).

"This rule is grounded, most reasonably, on the premise that a buyer of a business should be

permitted to restrict his seller's freedom of trade so as to prevent the latter from recapturing and

utilizing, by his competition, the good will of the very business which he transferred for value"

*Purchasing Assocs., Inc. v. Weitz*, 13 N.Y.2d 267, 271 (1963) (citations omitted). Indeed,

restrictive covenants are "routinely enforced" in this context because the purchaser has bargained

for the restrictive covenants as part of the sale. *Mathias v. Jacobs*, 167 F. Supp. 2d 606, 611

(S.D.N.Y. 2001). "It is the settled law of this State that one who sells a business to another has a

legal duty to refrain from acting to impair the 'good will' transferred to the purchaser in

exchange for part of the purchase price." *Hyde Park Prods. Corp. v. Maximilian Lerner Corp.*,

65 N.Y.2d 316, 321 (1985). In the sale of a business, "the vendor is not at liberty to destroy or

depreciate the thing which he has sold." *Mohawk Maint. Co. v. Kessler*, 52 N.Y.2d 276, 286

(1981) (citation omitted).

The rule that restrictive covenants ancillary to the sale of a business generally will be

enforced applies not only to covenants contained in contracts of sale themselves, but also to

covenants contained in other contracts, such as employment agreements, that arise out of the sale

of a business. *Payment Alliance*, 530 F. Supp. 2d at 483. Here, because Ira and Alan Kristel

entered into their Agreements in conjunction with the sale of CEM to Cenveo (Compl. ¶ 10), the

restrictive covenants therein fall under the "sale of business analysis." *Payment Alliance*, 530 F.

Supp. 2d at 483. Further, courts have enforced restrictive covenants ancillary to the sale of a business, such as those here, where the seller agrees not to solicit the buyer's employees. *See, e.g., Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, 07 CV 1562 (ERK) (RML), 2008 U.S. Dist. LEXIS 5389, *33 (E.D.N.Y. Jan. 24, 2008) (enforcing agreement not to solicit employees).

Even if the restrictive covenants here were to be analyzed under the heightened standard for covenants contained simply in employment agreements, the covenants are enforceable under New York law. Restrictive covenants contained in employment agreements will be enforced if they are reasonably limited in time and scope, to the extent necessary to protect an employer from unfair competition that stems from the disclosure of trade secrets or other confidential information or, as is the case here, where the employees in question perform unique services. *Ticor Title Ins. Co.*, 173 F.3d 63 at 70; *Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 234 A.D.2d 200, 201-03 (1st Dep't 1996). Thus, New York recognizes the enforceability of covenants not to solicit employees contained in employment contracts. *Global Telesystems, Inc.*, 151 F. Supp. 2d at 482 (citing *Veraldi v. Am. Analytical Labs, Inc.*, 271 A.D.2d 599, 600 (N.Y. App. Div. 2d Dep't 2000)). Because these agreements do not restrict the employment opportunities available to employees, "but simply limit who may solicit or encourage such opportunities . . . they do not implicate the policy concerns raised by covenants against competition" *Ikon Office Solutions, Inc.*, 2008 N.Y. Slip Op. 52499U, at 16 n. 7.

The restrictive covenants contained in the Agreements are reasonable under New York law and "clearly impose a continuing obligation to refrain from soliciting" Cenveo's employees. *Id.* at 16 (enforcing non-solicitation agreement entered into by seven of plaintiff's former employees). In the SPA and Noncompetition Agreement, Ira and Alan Kristel agreed that for five years following the sale of CEM they would not "directly or indirectly . . . . otherwise

engage or participate in any effort or act to induce any Person to discontinue a relationship with the Company or its Subsidiaries or Buyer or any of its Affiliates." (Compl. Ex. A § 6.7(b).) In his Employment Agreement, Alan Kristel agreed that for two years following the termination of their employment with Cenveo, he would not directly or indirectly solicit for employment any Cenveo employees or "induce or attempt to induce any employee, consultant or independent contractor of any Company Entity who was an employee, consultant or independent contractor of any Company Entity as of the date of this Agreement or at any time during the 12 months prior to your termination of employment to terminate his or her employment with, or otherwise cease his or her relationship with, the Company." (Compl. Ex. B § 6(b).) Courts have upheld restrictive covenants of similar lengths under New York law. *See, e.g., Bradford v. New York Times Co.*, 501 F.2d 51, 58 (2d Cir. 1974) (ten years); *Global Switching*, 2006 U.S. Dist. LEXIS 44450, at *49-50 (two years is a "reasonable time restriction"); *Good Energy, L.P. v. Kosachuk*, 853 N.Y.S.2d 75 (App. Div. 1st Dep't 2008) (five years).

Cenveo will likely succeed in showing that Ira and Alan Kristel have breached these restrictive covenants and directly or indirectly solicited and/or hired CEM employees for employment at Diversapack and/or induced CEM employees to discontinue their relationship with Cenveo. For example, as discussed *supra*, in April 2009, the Kristels hosted a party in New York that was attended by several CEM employees. (Ball Aff. ¶ 25.) At this party, the Kristels told the CEM employees of their plans to open Diversapack's Altoona plant and made false statements about CEM's financial state. (Ball Aff. ¶ 27.) At least one then-CEM employee who attended this party has since left CEM to work for Defendants. (Ball Aff. ¶¶ 25, 29.) Further, as discussed in detail in the Statement of Facts, *supra*, and in the Ball Aff. and Stangroom Decl., Cenveo has become aware that a number of other former CEM employees who have recently left

its employ are now working for Defendants. As just a few examples, Mr. Ball, the Altoona CEM General Manager, has been told by various vendors that certain former CEM employees are now working for Diversapack. (Ball Aff. ¶¶ 22, 23, 28.) These employees include former CEM Plant Manager Jerry Salafrio, former CEM Graphics Supervisor Chad Wilt, and former CEM Electronics Expert Jim Miller. (*Id.*) Mr. Wilt also appears on promotional materials on Diversapack's website. (Ball Aff. ¶ 23.) The names of former CEM Sales Managers Bob Gerardo and Ed Riguardi also appear on Diversapack's website. (Stangroom Decl. ¶ 16.)

These former CEM employees performed unique services such that Ira and Alan Kristel's restrictive covenants would be enforced as to their solicitation and/or inducement of these employees.

> In analyzing whether an employee's services are unique, the focus today is less on the uniqueness of the individual person of the employee, testing whether such person is extraordinary in the sense, for example, of Beethoven as a composer, Einstein as a physicist, or Michelangelo as an artist, where one can fairly say that nature made them and then broke the mold. Instead, now the inquiry is more focused on the employee's relationship to the employer's business to ascertain whether his or her services and value to that operation may be said to be unique, special or extraordinary; that inquiry, because individual circumstances differ so widely, must of necessity be on a case-by-case basis.

*Ticor Title Ins. Co.*, 173 F.3d at 65. New York courts have enforced restrictive covenants relating to employees that provided similar services to those involved here. *See, e.g., IBM*, 2008 U.S. Dist. LEXIS 95516, at *40 (former employee found to be unique where employee had extensive knowledge of the plaintiff's computer architecture), *Bradford*, 501 F.2d at 58 (executive responsible for newspaper's business operations was found to be "special, unique or extraordinary"); *Uniform Rental Div., Inc. v. Moreno*, 441 N.Y.S.2d 538, 539 (N.Y. App. Div. 2d Dep't 1981) (enforcing restrictive covenant against "plaintiff's 'star' salesman"); *Maltby v. Harlow Meyer Savage Inc.*, 633 N.Y.S.2d 926, 929 (Sup. Ct. N.Y. County 1995), aff'd, 637

24

N.Y.S.2d 110 (1st Dep't 1996) (trading desk brokers found to be unique where brokers had relationships with customers developed at the plaintiff's "expense and encouragement" and it would take at least six months for their replacements to develop similar relationships).

As detailed in the Ball Aff. and Stangroom Decl., the CEM employees that Ira and Alan Kristel have wrongfully raided provided "unique, special or extraordinary" services and value to CEM's operations. As just a few examples, CEM has been unable to fill the vacancy filled by Mr. Wilt's departure because of his unique and special abilities to examine a printed piece and determine how to adjust the screen dots to affect the color in a final print in relatively few attempts and his high fluency in the sophisticated, cutting edge graphics and software programs that require constant practice and training. (Ball Aff. ¶ 23.) Since June 19, 2009, CEM has lost four A- and B-level Adjusters from its Altoona and Jersey City facilities with over 70 years of training and experience in setting up, troubleshooting and adjusting CEM's sophisticated machinery. (Ball Aff. ¶¶ 29-31, Stangroom Decl. ¶ 18.)

Unlike *Lazer Inc. v. Kesselring*, 13 Misc. 3d 427, 433 (Sup. Ct. Monroe County 2005), where a New York court declined to enforce a covenant not to solicit employees, Cenveo has shown here that the employees wrongfully raided by Ira and Alan Kristel are "particularly valuable or unique employee[s]." Indeed, Ira and Alan Kristel have induced numerous CEM employees whom they knew "provided services to [Cenveo] which cannot easily be replaced" to discontinue their relationships with Cenveo. *Id.* The reasoning of *Lazer* is even less applicable here because, as discussed *supra*, the Agreements here are ancillary to the sale of CEM to Cenveo and thus the restrictive covenants should be analyzed under a less stringent standard than those entered into purely in the employment context. *Lazer*, 13 Misc. 3d at 433. Also, unlike in

25

*Lazer*, Defendants here have raided Cenveo of a large number of valuable and unique employees, and not just one salesperson. *Id.*

Therefore, Cenveo is likely to succeed on the merits of its Breach of Contract claims against Ira and Alan Kristel.

## 2. Breach of Fiduciary Duty

Cenveo will likely succeed on its claims against Ira and Alan Kristel for breach of fiduciary duty. It is a fundamental principal of New York law that "an employee is to be loyal to his employer and is 'prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" *W. Elec. Co. v. Brenner*, 41 N.Y.2d 291, 295 (1977) (quoting *Lamdin v. Broadway Surface Adver. Corp.*, 272 N.Y. 133, 138 (1936)). An employee continues to owe its employer a fiduciary duty even after he has left its employment. *See Duane Jones, Co. v. Burke*, 306 N.Y. 172, 189 (1954).

Cenveo will be able to prove that Ira and Alan Kristel breached their fiduciary duties. An employee breaches his duty of loyalty towards his former employer where, as is the case here, that employee abuses his fiduciary relationship to solicit the former employer's employees for the benefit of another entity. *Frederick Chusid & Co. v. Marshall Leeman & Co.*, 279 F. Supp. 913, 918 (S.D.N.Y. 1968) ("[s]oliciting employees to leave their employer constitutes a breach of this good-faith duty"); *cf. Duane Jones Co.*, 306 N.Y. at 188-89 (finding defendants breached their duty of loyalty by soliciting the plaintiff's employees to work at a newly formed company while all were still employed by the plaintiff).

Whether or not Ira and Alan Kristel began to solicit Cenveo's employees to work for Diversapack before or after the termination of their employment is of no matter. They cannot "be relieved of liability for advantages secured by them, after termination of their Cenveo

26

employment, as a result of opportunities gained by reason of their employment relationship."
*Duane Jones*, 306 N.Y. at 189. Like in *Duane Jones*, Ira and Alan Kristel used the knowledge
gained as Cenveo's fiduciaries to selectively target and raid Cenveo of the key employees vital to
the operations of CEM's Altoona plant. *Id.* at 184-85.

Thus, Cenveo is likely to succeed on its claim against Ira and Alan Kristel for Breach of
Fiduciary Duty.

### 3. Participation in Breach of Fiduciary Duty

Cenveo is likely to succeed on the merits of its claim that Diversapack participated in Ira
and Alan Kristel's breach of their fiduciary duties. To state a claim for participating in a breach
of fiduciary duty, a plaintiff must show "(1) a breach by a fiduciary of obligations to another, (2)
that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff
suffered damages as a result of the breach." *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847-48
(2d Cir. 1987) (quoting *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir. 1986)). It is a
"longstanding" rule of New York law that anyone who knowingly participates in the breach of a
fiduciary duty is responsible for the full amount of the damage caused by the breach. *S & K
Sales*, 816 F.2d at 848. As discussed *supra*, Ira and Alan Kristel breached the fiduciary duties
owed to Cenveo and Diversapack was well aware of these duties. Diversapack knowingly
participated in the scheme to unlawfully compete with Cenveo by impermissibly raiding Cenveo
of its valuable and unique employees. *See S & K Sales*, 816 F.2d at 850 (upholding verdict
against defendant on claim of aiding and abetting fiduciary duty where defendant employer
authorized individual defendant to improperly solicit plaintiff's employees). Therefore, Cenveo
is likely to succeed on the merits of its claim for against Diversapack for Participation in Breach
of Fiduciary Duty.

### 4. Tortious Interference With Contract

Cenveo is also likely to succeed on the merits of its tortious interference claim. To state a claim for tortious interference with contract, a plaintiff must show "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of a breach of contract by the third party; and (4) damages caused by the breach." *Innovative Networks v. Satellite Airlines Ticketing Ctrs.*, 871 F. Supp. 709, 727 (S.D.N.Y. 1995).

As discussed *supra*, Cenveo entered into contractual agreements with Ira and Alan Kristel by which they agreed, *inter alia*, not to raid Cenveo's employees. Diversapack was well aware of these agreements. On June 24, 2009, Cenveo contacted Diversapack, demanding that the Kristels comply with the terms of their non-raiding agreements. (Compl. Ex. E.) Notwithstanding this knowledge of the Kristels' non-raiding agreements, Diversapack intentionally procured a breach of these agreements by raiding Cenveo's uniquely skilled employees. Indeed, since June 24, 2009, CEM has lost a number of valuable employees that Cenveo believes are now employed by Diversapack, including, as discussed *supra*, four highly skilled Adjusters from CEM's Altoona and Jersey City plants. (Ball Aff. ¶¶ 29-31, Stangroom Decl. ¶ 18.)

Thus, Cenveo is likely to succeed on the merits of its claim for tortious interference with contract against Diversapack. *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1114 (E.D.N.Y. 1991) (finding that plaintiff was likely to succeed on the merits of its tortious interference with contract claim and noting that "to prevent former employees from accomplishing indirectly what they may not do directly . . . the new employer may be enjoined").

### 5. Tortious Interference With Employment Relations

A claim for tortious interference with employment relations is stated where the plaintiff can show that a "third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice." *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001) (quoting *Cohen v. Davis*, 926 F. Supp. 399, 403 (S.D.N.Y. 1996)). In violation of the fiduciary duties owed by the Kristels to Cenveo, Defendants interfered with the employment relations between Cenveo and its unique and valuable employees. Further, Defendants knew that inducing these unique and valuable employees to resign could "cripple [Cenveo's] business." *Celebrity Serv. Int'l, Inc. v. Celebrity World, Inc.*, No. 86 Civ. 8593 (RO), 1988 U.S. Dist. LEXIS 16079, at *40 (S.D.N.Y. Apr. 4, 1988) (finding for the plaintiff on a claim of tortious interference).

Therefore, Cenveo is likely to succeed on the merits of its claim for tortuous interference with employment relations against Defendants.

### C. Balance of Hardships

Even if Cenveo has not shown a likelihood of success on the merits of its claims, which is not the case, there clearly exist serious questions of fact going to the merits of its claims and the balance of the hardships favors Cenveo. As discussed *supra*, while Cenveo will be irreparably harmed in the absence of an injunction, Diversapack and the Kristels will suffer little detriment if they are enjoined from continuing their unlawful activities. Cenveo is not seeking to preclude Defendants from operating their business nor is it seeking to preclude its former employees from earning a living. Rather, Cenveo merely wants to prevent Defendants from unlawfully raiding its most valuable and unique employees, in violation of the contractual and fiduciary duties that the Kristels voluntarily took on. The equities clearly favor a plaintiff in this circumstance. *See, e.g.,*

29

*IBM*, 2008 U.S. Dist. LEXIS 95516, at *43 (finding that the defendant must "accept the obligations he undertook" when employed by plaintiff and that the balances of hardships weighed in favor of ordering an injunction); *Global Telesystems, Inc.*, 151 F. Supp. 2d at 483 (enjoining competitor from employing former high-level employee where balance of hardships tipped decidedly in employer's favor); *Natsource LLC*, 151 F.Supp.2d 465 at 472 (S.D.N.Y. 2001) (balance of hardships weighed in favor of granting an injunction to prevent former employee from violating non-solicitation agreement); *Ecolab v. K.P. Laundry Mach., Inc.*, 656 F. Supp. 894, 900 (S.D.N.Y. 1987) (injunction granted on finding that balance of hardships tipped decidedly in direction of enforcing non-solicitation covenant where defendant induced employees to breach it); *Frederick Chusid & Co*, 279 F. Supp. at 919 ("[b]alance of equities and hardships warrant[ed]" injunctive relief to enjoin five former employees who formed new competing company from soliciting plaintiff's employees to leave their employment); *Ikon Office Solutions*, 2008 Slip Op. 52499U, at *17 (balance of equities favored the plaintiff where requested injunction would not prevent individual defendants from working with new employer).

## CONCLUSION

For the foregoing reasons, Cenveo respectfully requests that the Court enjoin Defendants and their employees, officers, agents, subsidiaries or affiliates from soliciting, recruiting and/or hiring Cenveo's employees, and/or inducing Cenveo's employees to discontinue their relationships with Cenveo.

Dated: New York, New York
August 28, 2009

HUGHES HUBBARD & REED LLP

By: _____
Ned H. Bassen
Jason Habinsky
Alexander Bogdan
One Battery Park Plaza
New York, New York 10004
(212) 837-6000
bassen@hugheshubbard.com
habinsky@hugheshubbard.com
bogdan@hugheshubbard.com

Attorneys for Plaintiff
Cenveo Corporation

31