UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

CENVEO CORPORATION,

               Plaintiff,

       - against -

DIVERSAPACK LLC, IRA B.
KRISTEL, and ALAN J. KRISTEL,

           Defendants.

------------------------------------------------ X

**OPINION AND ORDER**

09 Civ. 7544 (SAS)



```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/1/09
```

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Cenveo Corporation ("Cenveo"), an envelope and paper product manufacturing company, purchased Commercial Envelope Manufacturing Co. ("CEM") from Ira and Alan Kristel (the "Kristels") and other members of the Kristel family in 2007.  The Kristels subsequently purchased an ownership interest in Diversapack LLC ("Diversapack," and together with the Kristels, "defendants"), a packaging product manufacturing company.  Between 2008 and 2009, fourteen of Cenveo's hundreds of at-will employees left CEM.  At least twelve now work for Diversapack.  Cenveo now seeks to enjoin defendants from "soliciting, recruiting and/or hiring Cenveo employees, and/or inducing them to discontinue

their relationship with Cenveo."[1]  For the reasons discussed below, Cenveo's motion is denied.

## II.    BACKGROUND

### A.    Parties and Claims

Cenveo provides print and visual communications products and services, including commercial print services, creative services, envelopes, forms and labels, mailing services, and similar materials, to a variety of clients.[2]  Ira and Alan Kristel, the former owners of CEM, are owners and executives of Diversapack.[3]  Diversapack is a company that manufactures polymer-based flexible films in the packaging industry.[4]  Cenveo concedes that Diversapack is not a competitor.[5]  In addition to its request for a preliminary injunction, Cenveo brings breach of contract and breach of fiduciary duty claims against the Kristels, aiding and abetting breach of fiduciary duty[6] and tortious interference with contract

---

[1]    Complaint ("Compl.") at 24 (Relief A).

[2]    *See id.* ¶ 4.

[3]    *See id.* ¶¶ 5, 6.

[4]    *See* 9/8/09 Declaration of Alan Kristel ("Kristel Decl.") ¶ 11.

[5]    *See* Compl. ¶ 36; Memorandum of Law in Support of Plaintiff's Order to Show Cause for a Preliminary Injunction ("Pl. Mem.") at 10.

[6]    Cenveo refers to this claim as "Participation in Breach of Fiduciary Duty."  Compl. Count IV.  In reality, Cenveo is bringing an aiding and abetting

2

claims against Diversapack, and a tortious interference with employment relations claim against all defendants.[7]

## B.     CEM's Sale to Cenveo

On July 17, 2007, Cenveo purchased CEM for approximately $230 million from members of the Kristel family.[8]  At the time, CEM had five manufacturing plants:  Deer Park, Long Island; Carlstadt, New Jersey; Boone, Iowa; Altoona, Pennsylvania; and Kirksville, Missouri.[9]  CEM employed more than two hundred and fifty people and produced twenty million envelopes per day at the Altoona plant alone.[10]  Once the transaction closed on August 30, 2007, members of the Kristel family continued to work with Cenveo in various capacities for the next few months.[11]  Ira Kristel stopped working for Cenveo in December 2007, and the remaining members of the Kristel family, including Alan Kristel, left

---

claim. *See id.* ¶ 82 ("Diversapack aided and abetted . . . .").

[7]      *See id.* ¶¶ 58-98.

[8]      *See* Pl. Mem. at 1; Compl. ¶ 9.

[9]      *See* Kristel Decl. ¶ 6.

[10]     *See id.* ¶ 12.  Kristel also states that he "has been informed that approximately 125 full-time people presently work at the Altoona plant." *Id.* Cenveo does not confirm or deny this number.

[11]     *See* Compl. ¶¶ 10-11.

in February 2008.[12]

### C.    Sale Agreements

Pursuant to the sale, Cenveo entered into several agreements relevant to this motion – a Stock Purchase Agreement with the Kristel family, including Ira and Alan Kristel ("SPA"), a noncompetition agreement with Ira Kristel ("Noncompetition Agreement"), and an employment agreement with Alan Kristel ("Employment Agreement") (collectively "Agreements").  Each of these Agreements included an "Anti-Raiding Provision."  The SPA and Noncompetition Agreement Anti-Raiding Provisions are identical and provide that – for a period of sixty months beginning on the August 30, 2007 Closing Date – (i.e., until August 2012) the Kristels could not

> (i) *solicit* for employment, *recruit or hire* . . . any employee . . . of [Cenveo] . . . who was an employee . . . of [Cenveo] . . . . as of the date of this Agreement or at any time thereafter and prior to the expiration of such 60-month period to become an employee . . . . to any *Competing Business* . . . or . . . (iv) otherwise engage or participate in any effort or act to induce any *Person* to discontinue a relationship with [Cenveo]. . . .[13]

---

[12]    *See* Kristel Decl. ¶ 10; Compl. ¶ 34.

[13]    Stock Purchase Agreement, dated July 17, 2007, among Cenveo, CEM, Ira Kristel, Alan Kristel, Steven Kristel, and William Wachtel, Ex. A to Compl., ("SPA") § 6.7(b)(emphasis added).  *Accord* Noncompetition Agreement, dated July 17, 2007, between Cenveo and Ira Kristel, Ex. C to Compl., ("Noncompetition Agreement") § 1.1(b).

"Competing Business" is defined in each agreement as "any business competitive with the business conducted and proposed to be conducted as of the Closing Date by [CEM]."[14] "Person" is defined in the SPA to include any "individual."[15]

The Anti-Raiding Provision in Alan Kristel's Employment Agreement provides that, for a period of two years after Alan Kristel's February 2008 termination date (i.e., until February 29, 2010)[16], Alan Kristel

> will not, directly or indirectly: (i) *solicit* for employment, *recruit* or *hire* . . . any employee . . . of [Cenveo] who was an employee . . . of [Cenveo] as of [July 13, 2007] or at any time during the 12 months prior to [February 2008]; (ii) *induce* or attempt to induce any employee . . . of [Cenveo] who was an employee . . . as of the date of this Agreement or at any time during the 12 months prior to [February 2008] to terminate his or her employment with, or otherwise cease his or her relationship with [Cenveo].[17]

---

[14]   SPA § 6.7(a). *Accord* Noncompetition Agreement § 1.1(a).

[15]   Ex. A to SPA, Ex. B to Declaration of Jason Habinsky, Cenveo's Outside Counsel, at A-7. No party has provided the corresponding definitions to the Noncompetion Agreement. I shall assume that "Person" is defined in the Noncompetion Agreement as it is defined in the SPA.

[16]   *See* 6/24/09 Email from Timothy Davis, Cenveo General Counsel, to A. Kristel, Ex. F to Compl. *Accord* 9/9/09 Declaration of Davis ¶ 5.

[17]   Employment Agreement, dated July 17, 2007 between Cenveo and Alan Kristel, Ex. B to Compl. ("A. Kristel Employment Agreement"), § 6(b) (emphasis added). Ira Kristel also entered into a consulting agreement with Cenveo, but the consulting agreement does not include a non-competition or anti-raiding provision. *See* Consulting Agreement, dated July 17, 2007, between Cenveo and Ira Kristel, Ex. E to 9/8/09 Declaration of George Patterson, Kristels' counsel ("Patterson Decl.").

Although the Anti-Raiding provision in the Employment Agreement does not include the modifier "to any Competing Business," the Anti-Raiding Provision in the Employment Agreement appears under the heading "Covenant not to Compete, etc."[18] The Anti-Raiding Provisions in the SPA and Noncompetition Agreements do not restrict the Kristels from soliciting, recruiting, inducing, or hiring *former* Cenveo employees.[19] In addition to prohibiting the recruitment and hiring of *current* Cenveo employees, the Anti-Raiding Provision in Alan Kristel's Employment Agreement implicitly bars soliciting, recruiting, or hiring *former* Cenveo employees if they were employed by Cenveo between February 2007 and February 2008 – the twelve months prior to Alan Kristel's departure from Cenveo.[20]

Each of the Agreements also includes a "Substantial Harm" provision which provides that

> the restrictions contained in [the Anti-Raiding Provisions] are a reasonable and necessary protection of the immediate interests of [Cenveo], and any violation of these restrictions would cause *substantial injury* to [Cenveo] and that [Cenveo] would not have entered into this Agreement

---

[18]   A. Kristel Employment Agreement § 6.

[19]   *See* SPA § 6.7(b); A. Kristel Employment Agreement § 6(b); Noncompetition Agreement § 1.1(b).

[20]   *See* A. Kristel Employment Agreement § 6(b).

6

> without receiving the additional consideration offered by
> [the Kristels] in binding themselves to these restrictions.[21]

The Substantial Harm provision also provides that "[i]n the event of a breach . . .

by [the Kristels] or any Affiliate of [the Kristels] . . . , [Cenveo] will be entitled to

an *injunction* restraining [the Kristels] or their Affiliates . . . from such breach . . .

without the necessity of proving the inadequacy as a remedy of money damages . .

. ."[22]

## D.   The Kristels' Acquisition of Diversapack

In September 2008, the Kristels purchased an ownership interest in

Diversapack.[23]   Prior to that purchase, on May 30, 2008, the Kristels and Cenveo

entered into a Letter Agreement ("Letter Agreement").[24]   The Letter Agreement

provided that the Kristels "shall not be deemed to be in breach of their obligations

under Section 6.7(a) of the [SPA], solely by virtue of their ownership of, or

rendering of services to, a business that manufacturers polymer-based flexible

---

[21]     SPA § 6.7(e) (emphasis added). *Accord* A. Kristel Employment
Agreement § 6(d); Noncompetition Agreement § 1.1(e).

[22]     SPA § 6.7(e) (emphasis added). *Accord* A. Kristel Employment
Agreement § 6(d); Noncompetition Agreement § 1.1(e).

[23]     *See* Kristel Decl. ¶ 11; Compl. ¶ 35.

[24]     *See* Letter Agreement, dated May 30, 2008, among Cenveo, William
Wachtel, Ira Kristel, Mindy Kristel, Alan Kristel, Steven Kristel, and Kristel
Associates LLC, Ex. D to Compl. ("Letter Agreement"), at 1.

7

films used in the packaging industry."[25]  The Letter Agreement does not expressly relieve the Kristels from their obligations pursuant to Sections 6.7(b) through (e) of the SPA[26]  On July 11, 2009, Pennsylvania Governor Ed Rendell announced Diversapack's intention to open a facility in Tyrone, Pennsylvania.[27]  The plant opening will create one hundred and fifty new jobs.[28]  Cenveo concedes that "Diversapack does not presently compete directly for the same customers as CEM" but notes that Diversapack is installing the specialized equipment that is substantially similar to that used by CEM.[29]

### E.    Cenveo Closes Plants and Lays-Off Workers Due to Economic Downturn

In the second half of 2008 and first half of 2009, Cenveo's commercial printing segment was "significantly" negatively impacted by the "economic downturn, excess capacity and intense pricing pressures" in the

---

[25]    *See id.* at 4.  Section 6.7(a) of the SPA prohibited the Kristels from "directly or indirectly, engag[ing] or participat[ing] in, or render[ing] services to . . . any business competitive with the business as conducted and proposed to be conducted" for a period of sixty months after the conclusion of the sale of CEM to Cenveo.  SPA § 6.7(a).

[26]    *See* Letter Agreement at 4.

[27]    *See* Walt Frank, *Rendell: 2 Firms to Add 185 Jobs*, AltoonaMirror.com, July 11, 2009, Ex. I to Patterson Decl., at 1.

[28]    *See id.*

[29]    Pl. Mem. at 10.

commercial printing market and a reduction in the use of direct mail.[30]  Cenveo

embarked on a "cost savings and restructuring plan to reduce its operating costs

and realign its manufacturing platform in order to compete effectively during the

current economic downturn."[31]  This plan included, among other things, closing the

Deer Park, Carlstadt, and Boone plants and dismissing a large number of

employees at the remaining plants.[32]

### F.    Allegedly Raided Employees

The facts regarding the allegedly raided employees are hotly

contested.  The parties agree, however, that fourteen employees left Cenveo

between May 2, 2008 and August 28, 2009 and at least twelve now work for

---

[30]    *See* 6/27/09 Cenveo Quarterly Report, Form 10Q, Ex. K to Patterson
Decl. ("6/27/09 Cenveo 10Q"), at 28; Transcript of March 17, 2009 Cenveo Q4
Earnings Call, Ex. 4 to 9/8/09 Declaration of Anthony Wesley, Diversapack Chief
Financial Officer ("Wesley Decl.") ("3/17/09 Cenveo Tr."), at 3 (Cenveo CFO
Mark Hiltwein's acknowledgment that Cenveo has suffered economic losses
because of the general economic downturn and the state of the commercial
envelope industry).

[31]    6/27/09 Cenveo 10Q at 11.  *Accord* 3/17/09 Cenveo Tr. at 3 ("[W]e
are executing appropriate cost reduction actions in the envelope segment.  This will
include consolidation of our operational footprint by reducing the number of
production facilities.").

[32]    *See* 6/27/09 Cenveo 10Q at 28-29 (noting that in an effort to "improve
productivity" and "operating efficiencies" Cenveo "reduced [its] employee
headcount by approximately 1,300, primarily resulting from the closure of three
envelope plants, two commercial printing plants and a forms plant and
consolidated them into existing operations" in the first six months of 2009).

Diversapack.[33]  Cenveo submits the declarations of William Stangroom, Cenveo

Regional Vice President, and Francis Ball, General Manager of the Altoona

Pennsylvania plant.[34]  Stangroom and Ball each declare that he was either told by

unnamed individuals or knows on information and belief that each of the fourteen

former employees now works at Diversapack.[35]  With the exception of employees

Gerardo and Riguardi, neither Stangroom nor Ball state that they were told or

know that defendants recruited or hired the remaining twelve while they were

Cenveo employees.[36]

     Defendants submitted the declarations of Alan Kristel, Bryan Harber,

---

[33]    *See* Pl. Mem. at 10-17, and record citations therein.  These individuals are:  graphic technician Chad Wilt; specialized machine adjusters Bob Monohan, Bryan Harber, Rodger White, Michael McKnight; plant scheduler David Osborn; electricians Cirilo Sanchez and Jim Miller; sales representatives and managers John Knoesel, Bob Gerardo, Ed Riguardi; and plant managers and supervisors Jerry Salafrio, Daniel Moran and Joe Mielnik.  Defendants concede that all but Monohan and Sanchez now work for Diversapack.  *See* Kristel Decl. ¶¶ 14-21, 25-26.

[34]    *See* 8/27/09 Declaration of William Stangroom, current Cenveo employee ("Stangroom Decl."); 8/27/09 Declaration of Francis Ball, current CEM employee ("Ball Decl.").

[35]    *See* Stangroom Decl. ¶¶ 15-22; Ball Decl. ¶¶ 22-31.

[36]    *See* Stangroom Decl. ¶¶ 15-22; Ball Decl. ¶¶ 22-31. *Cf.* Stangroom Decl. ¶ 16 (noting that Gerardo and Riguardi "began to complain vigorously about various aspects of their employment," but stating "[u]pon information and belief, [Gerardo and Riguardi] began complaining once they had already secured an offer of employment with Diversapack").

former CEM and current Diversapack machine adjuster, John Knoesel, former

CEM and current Diversapack sales representative, and Chad Wilt, former CEM

and current Diversapack graphic technician.[37] Alan Kristel declares that only

twelve of the fourteen former Cenveo employees work for Diversapack.[38]

According to Kristel, of these twelve, at least seven left Cenveo voluntarily without

open job offers from defendants – including Gerardo and Riguardi.[39] Alan Kristel

neither admits nor denies that four of the five former Cenveo employees – Miller,

---

[37] See Kristel Decl., 9/3/09 Declaration of Bryan Harber ("Harber Decl."); 9/3/09 Declaration of John Knoesel ("Knoesel Decl."); 9/3/09 Declaration of Chad Wilt ("Wilt Decl.").

[38] See Kristel Decl. ¶¶ 19, 20 (stating that Sanchez and Monohan do not, and have never, worked for Diversapack).

[39] Knoesel left Cenveo to work for a non-party for six months and then sought employment with defendants. See Knoesel Decl. ¶ 3. Wilt left to start his own company and only joined Diversapack after his company proved unsuccessful. See Wilt Decl. ¶¶ 8-11. Salafrio retired from Cenveo, but left retirement six months later to work for Diversapack. See Kristel Decl. ¶ 15. Cenveo alleges that Gerardo and Riguardi had open job offers with defendants at which point they began complaining about their employment, see Stangroom Decl. ¶ 26, but Kristel states that this is "completely untrue" and notes that Cenveo fired both of them, see Kristel Decl. ¶ 17. Cenveo alleges that only Moran resigned from Cenveo and now works for Diversapack – not that he was offered this position while still employed by Cenveo. See Stangroom Decl. ¶ 17. Kristel declares that Moran resigned from Cenveo in March 2009, giving up the right to receive severance as a result, and collected unemployment benefits for several weeks before seeking employment at Diversapack. See Kristel Decl. ¶ 18. White voluntarily resigned and told Ball that he was leaving to "work on his family's farm," but now works at Diversapack. Ball Decl. ¶ 30; Kristel ¶ 21.

11

McKnight, Osborne, and Mielnik – were recruited and hired by defendants while

they were Cenveo employees.[40]  With regard to Miller, McKnight, and Osborn, the

time between leaving Cenveo and beginning employment with Diversapack is

short.[41]  Defendants do not address Cenveo's claim that Mielnik resigned on

December 19, 2008 and now works at Diversapack.[42]  The fifth former Cenveo

employee, Harber – who began working at Diversapack on July 20, 2007 –, all but

admits that he had a pending job offer when he resigned from Cenveo, effective

July 17, 2007.[43]  However, Harber claims he left Cenveo because he was

"miserable" and that he reached out to defendants first.[44]

---

[40]     *See* Kristel Decl. ¶¶ 21, 25, 26.

[41]     Miller resigned effective July 2, 2009, telling Ball that he "wanted to
try something else."  Ball Decl. ¶ 28.  "Shortly thereafter," Ball learned that Miller
was working for Diversapack.  *Id.*  Kristel states only that he "voluntarily resigned
and sought employment at Diversapack."  Kristel Decl. ¶ 25.  McKnight and
Osborn both resigned from Cenveo effective August 28, 2009, and as of the date of
Kristel's Declaration, September 8, 2009, worked for Diversapack.  *See* Ball Decl.
¶ 31; Stangroom Decl. ¶ 21; Kristel Decl. ¶¶ 21, 26.

[42]     *See* Ball Decl. ¶ 25; Kristel Decl. ¶ 28.

[43]     *See* Harber Decl. ¶¶ 1, 15, 20 ("[W]hen I announced my intention to
resign, I was asked where I was going . . . . [and] declined to state my plans . . . .");
Ball Decl. ¶ 29 (stating that Harber's resignation was effective as of July 17, 2009).

[44]     Harber Decl. ¶ 15 ("I was not recruited to come work for Diversapack.
I was miserable at CEM under Cenveo so I reached out for former CEM employees
who had found a new home at Diversapack and asked whether a position might be
available. . . .").

12

Cenveo has not identified any current employees that it believes defendants intend to hire or that are critical to its operation. The fourteen former employees can be categorized into three types: (1) those familiar with technical aspects of running specialized machinery and software; (2) those who are skilled at sales and marketing; and (3) those with management expertise.[45] The parties disagree as to whether these jobs require unique skills and substantial training such that the former employees are unique and difficult to replace.[46]

### G.    The April 2009 Kristel Party

In April 2009, Alan Kristel hosted his son's bar mitzvah in Long Island, New York.[47] He invited "several" Cenveo employees, including Knoesel, Wilt and Harber.[48] Ball, who did not attend the bar mitzvah, claims that he learned from an unnamed third party that the Kristels allegedly told attendees that the Kristels planned to open a plant near the Cenveo Altoona plant "as a service to the Altoona-based [Cenveo] employees."[49] Ball also claims that this unnamed third

---

[45]    *See* Pl. Mem. at 3-7.

[46]    *See id.*; Kristels' Memorandum of Law in Opposition ("Kristel Opp.") at 8; Diversapack's Memorandum of Law in Opposition ("Diversapack Opp.") at 16.

[47]    *See* Ball Decl. ¶ 25; Kristel Decl. ¶ 28.

[48]    *Id.*

[49]    Ball Decl. ¶ 27.

13

party told him that the Kristels allegedly made false statements to the Cenveo

employees about Cenveo's financial state.[50]   Knoesel, Wilt, and Harber all dispute

that they, or any other Cenveo employee, discussed possible employment at the bar

mitzvah or that the Kristels made any disparaging or critical comments about

Cenveo.[51]

## III.   APPLICABLE LAW

### A.   Hearsay Evidence

"[T]he Court may consider hearsay evidence in a preliminary

injunction hearing."[52]   Nevertheless, a court may weigh evidence based on whether

such evidence would be admissible under the Federal Rules of Evidence.[53]

---

[50]     *See id.*

[51]     *See* Kristel Decl. ¶ 27; Harber Decl. ¶ 16; Wilt Decl. ¶ 12; Knoesel Decl. ¶ 19.

[52]     *Zeneca Inc. v. Eli Lilly & Co.*, No. 99 Civ. 1452, 1999 WL 509471, at *2 (S.D.N.Y. July 19, 1999). *Accord Barturen v. Wild Edibles, Inc.*, No. 07 Civ. 8127, 2007 WL 4468656, at *3 n.5 (S.D.N.Y. Dec. 18, 2007) ("Hearsay evidence may be considered in deciding a motion for a preliminary injunction"); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) (collecting several circuit decisions).

[53]     *See Zeneca Inc.*, 1999 WL 509471, at *2. *See also Securities Exchange Comm'n v. Musella*, 578 F. Supp. 425, 427-28 (S.D.N.Y. 1984) (noting that a court need not discount hearsay evidence presented in an application for a preliminary injunction hearing if such evidence is found to be "inherently trustworthy").

14

## B.    Preliminary Injunction Standard

"'The district court has wide discretion in determining whether to grant a preliminary injunction . . . .'"[54] Nonetheless, "'[a] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion.'"[55] "'A party seeking a preliminary injunction in this circuit must show: (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'"[56] "A preliminary injunction is an extraordinary remedy never awarded as of right."[57] "The purpose of a preliminary injunction is to preserve the *status quo*

---

[54]    *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quoting *Moore v. Consolidated Edison*, 409 F.3d 506, 511 (2d Cir. 2005)). *Accord Somoza v. New York City Dep't of Educ.*, 538 F.3d 106, 112 (2d Cir. 2008) (noting that a district court decision concerning a preliminary injunction is reviewed for abuse of discretion).

[55]    *Sussman v. Crawford*, 488 F.3d 136, 139-40 (2d Cir. 2007) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

[56]    *County of Nassau, N.Y. v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008) (quoting *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476 (2d Cir. 2004)).

[57]    *Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365, 376 (2008) (citation omitted).

between parties pending a final determination of the merits."[58]

"'To satisfy the irreparable harm requirement, [petitioner] must
demonstrate that absent a preliminary injunction [it] will suffer an injury that is
neither remote nor speculative, but actual and imminent, and one that cannot be
remedied if a court waits until the end of trial to resolve the harm.'"[59]  Moreover,
irreparable harm by definition "'cannot be remedied by an award of monetary
damages.'"[60]  In determining whether a plaintiff has demonstrated a likelihood of
success on the merits of the "ultimate case, a court is not called upon finally to
decide the merits of the controversy.  It is necessary only that the court find that the
plaintiff has presented a strong prima facie case to justify the discretionary
issuance of preliminary relief."[61]

---

[58]     *Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 143
F.3d 688, 692 (2d Cir. 1998).

[59]     *Grand River*, 481 F.3d at 66 (quoting *Freedom Holdings, Inc. v.
Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)).

[60]     *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 97 (2d Cir.
2005) (quoting *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995)).
*Accord Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) ("[W]here monetary
damages may provide adequate compensation, a preliminary injunction should not
issue.").

[61]     *Gibson v. U.S. Immigration & Naturalization Serv.*, 541 F. Supp. 131,
137 (S.D.N.Y. 1982) (citation omitted).

16

## IV.  DISCUSSION

### A.  Hearsay Evidence

Cenveo and defendants have submitted a number of declarations in support, and opposition to, Cenveo's motion. Doing so obviated the need for each of these individuals to testify at the preliminary injunction hearing and permitted the Court to be substantially more efficient in deciding this matter where the facts were undisputed. To the extent that the contents of the affirmations may not be admissible at trial had the declarant testified to the contents in their declaration – such as where they are based on double hearsay or violate Federal Rule of Evidence Rule 408 – the inadmissible material has been excluded from consideration.

### B.  Irreparable Harm

Cenveo argues that the Anti-Raiding Provisions illustrate Cenveo's concern that the Kristels may try to raid employees from Cenveo, and the Substantial Harm Provisions are the Kristels' admission that their raiding, if any, would constitute irreparable harm.[62]  However, the Substantial Harm Provision is

---

[62]     *See* Pl. Mem. at 18-20 (citing *Global Switching Inc. v. Kasper*, No. 06 Civ. 412, 2006 WL 1800001, at *10 (E.D.N.Y. June 29, 2006) ("Just as the violation of a non-compete in the solicitation of customers constitutes irreparable harm, the violation of a non-compete by the solicitation of employees also constitutes irreparable harm . . . .") and *Marsh USA Inc. v. Karasaki*, No. 08 Civ. 4195, 2008 WL 4778239, at *14 (S.D.N.Y. Oct. 30, 2008) ("the loss of [plaintiff's]

17

only implicated where a breach is shown to occur.[63]  Because Cenveo has not

shown a likelihood of success on the merits or raised sufficiently serious questions

as to whether the Kristels have breached the Anti-Raiding Provisions, the

Substantial Harm Provisions are rendered irrelevant.

Cenveo also contends that it has suffered irreparable harm as a result

of the departure of the fourteen employees and will continue to suffer such harm if

any further employees leave for Diversapack because these employees are unique.

The inquiry into whether an employee is unique is "focused on the employee's

relationship to the employer's business to ascertain whether his or her services and

value to that operation may be said to be unique, special or extraordinary; that

inquiry, because individual circumstances differ so widely, must of necessity be on

a case-by-case basis."[64]  "The unique services category [of employees against

whom equity will enforce a negative covenant] has not often been the basis upon

which a New York court has granted an injunction. . . ."[65]

Cenveo alleges that its employees are unique because it cannot find

_____

employees also constitutes irreparable harm")).

[63]     *See* SPA § 6.7(e); A. Kristel Employment Agreement § 6(d); Noncompetion Agreement § 1.1(e).

[64]     *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 65 (2d Cir. 1999).

[65]     *Id.* at 71 (citing *American Broad. Cos. v. Wolf*, 52 N.Y.2d 394, 403 n.6 (1981)).

suitable replacements, will need to invest time and money to train new employees, and their departure will affect Cenveo's ability to maintain its current level of productivity.[66] Cenveo also claims that due to the employee losses, the Altoona CEM Plant that was producing an average of 12.5 million envelopes per day as of June 2009 is now capable of producing only an average of nine million envelopes per day, "resulting in substantial losses that will continue to magnify."[67]

Yet it appears that Cenveo's statements are exaggerated. For example, Harber, an adjuster with approximately twenty-five years of experience whose work includes training unskilled workers to become adjusters, declares that the time needed to become a proficient adjuster ranges from weeks to months, depending on the employee's background and experience.[68] Similarly, Wilt, formerly a Cenveo graphic designer, specifically disavows that his work with Cenveo involved any "special and unique" skills.[69] In addition, Alan Kristel names at least twenty employees that were laid off by Cenveo who would be capable of

---

[66]    *See* Pl. Mem. at 18-20; Stangroom Decl. ¶¶ 6, 10 (claiming that certain positions require several years of on the job training).

[67]    *Id.* at 17 (citing Ball Decl. ¶ 33).

[68]    *See* Harber Decl. ¶ 17.

[69]    Wilt Decl. ¶ 13.

replacing these individuals and, incidently, remain unemployed.[70]  Because Cenveo

provides no substantiation for its assertion that finding and training suitable

replacements could take the many years it alleges, Cenveo has not met its burden

of a clear showing that replacements could not be found or adequately trained in a

relatively short period of time.[71]

        Cenveo also provides no support for its claim that the reduction in

productivity is a direct result of the loss of these fourteen employees as opposed to

the loss of the more than one hundred employees Cenveo has laid off at the same

plant or the more than one thousand employees Cenveo has laid off nationwide.

Furthermore, Cenveo's public representations attribute its declining output

company-wide to the general economic downturn and the state of the commercial

envelope industry – rather than to the loss of these fourteen employees or to

defendants' raiding.[72]  Thus, Cenveo has not made a clear showing that these

---

[70]    *See* Kristel Decl. ¶¶ 15, 22, 29, 30.

[71]    Even if Cenveo were to clearly show that replacements would take the alleged years to suitably train, Cenveo does not point to any cases that would support a finding of irreparable harm on this basis.

[72]    *See* 6/27/09 Cenveo 10Q at 28 (identifying the "economic downturn, excess capacity and intense pricing pressures" as the cause for its commercial printing segment's volume declines); 3/17/09 Cenveo Tr. at 3 (Cenveo CFO Mark Hiltwein's acknowledgment that Cenveo has suffered economic losses because of the general economic downturn and the state of the commercial envelope industry).

employees possess skills so special and unique as to warrant a finding of irreparable harm.[73]

      The core weakness of Cenveo's position is its failure to account for the fact that even if these employees were unique and irreplaceable – which is unlikely – and even if the loss of these employees was a direct cause of Cenveo's productivity and profitability decline, Cenveo cannot establish irreparable harm because Diversapack is not a competitor. The cases cited by Cenveo in support of a finding of irreparable harm turn on concerns of unfair competition between competitors. For example, in *Global Switching Inc. v. Kasper*, the defendant, in addition to poaching plaintiffs' clients, urged one of plaintiff's employees to resign

---

[73]    *See, e.g, Data Commc'n, Inc. v. Dirmeyer*, 514 F. Supp. 26, 33 (E.D.N.Y. 1981) (denying a motion for preliminary injunction upon a finding that defendant executive employee with in-depth knowledge of former employer's product did not possess "talents . . . so unique and extraordinary [as] to warrant protection equal to the protection afforded trade secrets"); *Quadnt's Wholesale Distrib., Inc. v. Giardino*, 448 N.Y.S.2d 809, 810 (3d Dep't 1982) ("Nothing more is claimed by plaintiff than that defendant [ ] was a very effective and well-trained salesman, familiar with plaintiff's customers and business methods. This may tend to establish that he was of high value to his employer; it does not establish his service as unique.") (quotation marks omitted); *Reed, Roberts Assoc., Inc. v. Strauman*, 40 N.Y.2d 303, 353 (1976) (holding that the loss of a vice-president with significant responsibilities regarding internal company policy did not constitute irreparable harm for the purposes of obtaining a preliminary injunction). *See also Ride the Ducks, LLC v. Duck Boat Tours, Inc.*, No. 04 Civ. 5595, 2005 WL 670302, at *13 (E.D. Pa. Mar. 21, 2005) (applying Pennsylvania law) (learning job-related skills, including mechanics of driving a specialized vehicle, "does not amount to the kind of specialized training that warrants protection via a restrictive covenant").

21

and join defendant and directed her to bring a hard-drive with plaintiff's billing information.[74] The employee began working for defendant within a few days of her resignation and used the billing information to contact and poach the plaintiff's clients.[75] The court granted a preliminary injunction and held that "[t]he loss of [the employee's] services . . . *and the provision of those services to [plaintiff's competitor]*," constituted irreparable harm.[76] Here, Cenveo concedes that Diversapack is not a direct competitor and has not alleged misappropriation of trade secrets, clients, or confidential information.[77] Without such claims, Cenveo

---

[74]    *See* 2006 WL 1800001, at *10.

[75]    *See id.*

[76]    *Id.* at *12 (emphasis added). *See also Marsh USA Inc.*, 2008 WL 4778239, at *6 (distinguishable because defendant actively recruited employee at issue, offered a compensation package that doubled or tripled the employee's current salary, and agreed to indemnify the employee in the event of litigation, and, once in the employee of the defendant, the employ began soliciting plaintiffs' clients and other employees; also, plaintiffs had emails and other documents evidencing the recruitment); *IBM v. Papermaster*, No. 08 Civ. 9078, 2008 WL 4974508, at *7 (S.D.N.Y. Nov. 21, 2008) (considering a similar substantial harm provision in a noncompetition agreement as evidence of irreparable harm, but finding irreparable harm where defendant would have inevitably drawn upon his prior highly technical experience and expertise in microprocessors while producing products for plaintiff's competitor and the potential that he would inadvertently disclose trade secrets); *Global Telesystems, Inc. v. KPNQwest, N.V.*, 151 F. Supp. 2d 478, 482 (S.D.N.Y. 2001) (finding irreparable harm on "both" the noncompetition agreement's irreparable harm provision and the continuing danger that the employee, plaintiff's former CFO, would transmit confidential information to new employer – plaintiff's direct competitor).

[77]    *See* Pl. Mem. at 10; Compl. ¶ 36.

has not made a clear showing of irreparable harm. Given that such a showing is a threshold requirement, Cenveo's motion can be denied on this ground alone.

### C.   Likelihood of Success on the Merits or Sufficiently Serious Questions Going to the Merits and Balance of Hardships

#### 1.   Conflict of Laws

The parties dispute whether Pennsylvania or New York law applies to Cenveo's tort claims.[78]  In a diversity action, New York choice of law rules govern.[79]  In resolving choice of law issues relating to tort claims, "New York applies an 'interest analysis' to identify the state that has the 'greatest interest' in the litigation."[80]  Defendants argue that Pennsylvania law should apply because the harm asserted stems from employees who worked at Cenveo's Altoona, Pennsylvania plant, and Cenveo alleges that they will ultimately work at Diversapack's future facility in Tyrone, Pennsylvania.[81]  This argument ignores that the Agreements provide that they are governed by New York law and the sale

---

[78]    *See* Kristels Opp. at 20; Diversapack Opp. at 17-18; Cenveo's Reply Memorandum of Law in Further Support at 3-5.

[79]    *See Cantor-Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 410 (2d Cir. 2002) ("To determine which state's law applies, a federal court sitting in diversity must apply the conflict-of-laws rules of the state in which the federal court sits.").

[80]    *M'Baye v. New Jersey Sports Prods., Inc.*, No. 06 Civ. 3429, 2007 WL 431881, at *10 (S.D.N.Y. Feb. 7, 2007) (citing *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996)).

[81]    *See* Diversapack Opp. at 17; Kristel Opp. at 20.

23

of CEM was completed in New York.[82]  In addition, Cenveo complains of

employees leaving plants in New Jersey and New York[83] and the Kristels work for

Diversapack in New York.[84]  I find that New York has the greatest interest in the

litigation and New York law should be applied.

### 2.    Breach of Contract Claims Against the Kristels

To make out a breach of contract claim under New York law plaintiffs

must show "(1) the existence of an agreement, (2) adequate performance of the

contract by the plaintiff, (3) breach of contract by the defendant, and (4)

damages."[85]  To establish a breach of contract claim on the basis of the Anti-

Raiding Provisions, Cenveo must first show that they are enforceable under New

York law.  "New York recognizes the enforceability of covenants not to solicit

employees,"[86] but such covenants "are subject to careful judicial scrutiny" and

---

[82]     *See* SPA §§ 1.2, 11.8; A. Kristel Employment Agreement § 7.6;
Noncompetition Agreement § 3.7.

[83]     *See* Compl. ¶¶ 38, 41-42, 45-46, 54; Knoesel Decl. ¶ 6.

[84]     *See* Wesley Decl. ¶ 7.

[85]     *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
375 F.3d 168, 177 (2d Cir. 2004) (quotation marks omitted).

[86]     *Global Telesystems, Inc.*, 151 F. Supp. 2d at 482 (citing *Veraldi v.
American Analytical Labs., Inc.*, 706 N.Y.S.2d 158 (2d Dep't 2000)).

must be reasonable.[87]  Under New York law, a restrictive covenant in an

employment agreement "'is reasonable only if it: (1) is no greater than is required

for the protection of the legitimate interest of the employer, (2) does not impose

undue hardship on the employee, and (3) is not injurious to the public.'"[88]  "An

employer may assert only four types of legitimate interests . . . : (1) protection of

trade secrets; (2) protection of confidential customer information; (3) protection of

an employer's client base; and (4) protection against irreparable harm where an

employee's services are unique or extraordinary."[89]

Of the four potential legitimate interests, Cenveo has alleged only that

it will suffer irreparable harm on the ground that its employees' services are

unique.  For the reasons already discussed, Cenveo fails to support this claim.

Accordingly, the Anti-Raiding Provisions are unenforceable and Cenveo cannot

show that it is likely to succeed on the merits or that it has raised sufficiently

---

[87]    *Silipos, Inc. v. Bickel*, No. 06 Civ. 2205, 2006 WL 2265055, at *3
(S.D.N.Y. Aug. 8, 2006) (citing *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A
Corp.*, 42 N.Y.2d 496, 499 (1977)).

[88]    *Kelly v. Evolution Mkts., Inc.*, 626 F. Supp. 2d 364, 374 n.9 (S.D.N.Y.
2009) (quoting *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (1999)).

[89]    *Silipos, Inc.*, 2006 WL 2265055, at *3 (citing *BDO Seidman*, 93
N.Y.2d at 388-89).

serious questions going to the merits of Cenveo's breach of contract claims.[90]

Even if the Anti-Raiding Provisions were enforceable, it is unlikely that defendants breached them because Diversapack is not a competitor. The Anti-Raiding Provisions in the SPA and Noncompetition Agreements contain two key clauses – one that specifically bars the Kristels from soliciting, recruiting, inducing and hiring current Cenveo employees for a "Competing Business" and one that more generally bars the Kristels from inducing any Person to end his or her "relationship" with Cenveo. The Anti-Raiding Provision's more specific clause requiring direct competition controls over the more general provision.[91]  As a result, Cenveo has not shown that it is likely to succeed on its claim that the Kristels have breached any Agreements by recruiting and hiring current and former Cenveo employees for Diversapack, a non-competitor. Furthermore, although the Anti-Raiding Provision in Alan Kristel's Employment Agreement does not

---

[90]     The Anti-Raiding Provisions also may be injurious to the public due to the restrictions they place on Cenveo employees who were not signatories to the Agreements. However, because Cenveo fails the first prong of the enforceability test, it is unnecessary to evaluate this third prong.

[91]     *See County of Suffolk v. Alcorn*, 266 F.3d 131, 139 (2d Cir. 2001) ("It is axiomatic that courts construing contracts must give 'specific terms and exact terms . . . greater weight than general language.'" (quoting *Aramony v. United Way of America*, 254 F.3d 403, 413 (2d Cir. 2003) (holding that even where there is no "true conflict" between two provisions, specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely towards the matter to which the specific words or clause relate)).

specifically include the "Competing Business" qualifier, the provision appears under the heading "Covenant Not to Compete, etc."  When read in conjunction with the SPA and Noncompetition Agreement, which were signed at the same time and involve the same transaction, it is reasonable to conclude that a breach of this provision of Alan Kristel's Employment Agreement also requires the involvement of a competitor.

Moreover, assuming *arguendo* the Anti-Raiding Provisions are enforceable and Diversapack is a competitor, Cenveo has not shown that the Kristels breached either the SPA or the Noncompetition Agreements by recruiting and hiring *former* Cenveo employees.[92]  Cenveo has failed to substantiate its contention that the fourteen employees left Cenveo because they were recruited or hired by defendants while they were Cenveo employees in violation of the SPA or Noncompetition Agreement.  Cenveo has shown merely that each employee resigned from Cenveo and then, after some number of days, weeks, or months, was hired by defendants.[93]  Noticeably absent from Cenveo's complaint, pleadings, and declarations are any communications between defendants and the fourteen former employees or any evidence directly linking the employee's departure to some

---

[92]     *See* Pl. Mem. at 21-26.

[93]     *See* Stangroom Decl. ¶¶ 15-21; Ball Decl. ¶¶ 22-31.

conduct by defendants. Because the SPA and Noncompetition Agreements do not

bar defendants from recruiting and hiring *former* Cenveo employees, and Cenveo

cannot substantiate its claims that defendants recruited or hired *current* Cenveo

employees, Cenveo fails to establish breach of the SPA or Noncompetition

Agreement.[94]  Given that the Anti-Raiding Provisions are likely unenforceable and

that, even if enforceable, such provisions were not breached by hiring employees

for Diversapack – a non-competitor – Cenveo has failed to show a likelihood of

success on the breach of contract claim or that there are sufficiently serious

questions on the merits of this claim and that the balance of hardships tips

decidedly in Cenveo's favor.

### 3.    Breach of Fiduciary Duty Claim Against the Kristels

The elements of a claim for breach of fiduciary duty under New York

law are "breach by a fiduciary of a duty owed to plaintiff; defendant's knowing

---

[94]     Because Alan Kristel's Employment Agreement prohibits him from
soliciting and hiring *former* Cenveo employees, *see* A. Kristel Employment
Agreement § 6(b), were the Anti-Raiding Provisions enforceable and Diversapack
a competitor, Cenveo would have shown a likelihood of success on the merits or
would have raised sufficiently serious questions going to the merits of this claim.
However, the balance of the hardships would not have tipped decidedly in
Cenveo's favor.  Thus, Cenveo still would not have made a clear showing that it is
entitled to a preliminary injunction.

participation in the breach; and damages."[95]   Cenveo alleges that the Kristels

breached their fiduciary duties as former employees of Cenveo when they recruited

Cenveo employees to leave Cenveo and join Diversapack.[96]   Cenveo offers as

support for this claim *Frederick Chusid & Co. v. Marshall Leeman & Co.* and

*Duane Jones Co. v. Burke* – notably old cases.[97]   Specifically, Cenveo latches on

to the court's statement in *Frederick* that "[s]oliciting employees to leave their

employer constitutes a breach of this good-faith duty [of loyalty]," a statement for

which *Frederick* cites *Duane Jones* for support.[98]

While the court in *Frederick* did not expressly place any limits on its

finding that a former employee owes its former employer a duty of loyalty not to

recruit the employer's other employees,[99] the court's statement cannot be read in a

vacuum. *Frederick*, like the other cases cited by Cenveo in support of its claims,

involved defendants who recruited the plaintiff's employees for a *competing*

---

[95]     *SCS Commc'ns., Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004) (citing *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 281-82 (2d Cir. 1992)).

[96]     *See* Pl. Mem. at 26.

[97]     *See id.* (citing *Duane Jones Co. v. Burke*, 306 N.Y. 172, 189 (1954) and *Frederick Chusid & Co. v. Marshall Leeman & Co.*, 279 F. Supp. 913, 918 (S.D.N.Y. 1968)).

[98]     *Frederick Chusid & Co.*, 279 F. Supp. at 918.

[99]     *See id.*

*corporation* and were alleged to have taken copyrighted material from their former employer.[100]  *Duane Jones* also involved the solicitation of plaintiff's employees to join a direct competitor.[101]  Diversapack is not a competitor, and no confidential information, clients, or trade secrets are alleged to have been taken. Cenveo has failed to show a likelihood of success on the merits or raise sufficiently serious questions going to the merits as to make them a fair ground for litigation.

Moreover, Cenveo has failed to demonstrate that the balance of hardships tip decidedly in its favor.  In the context of a covenant-restricting employment, the court must weigh the "employer's legitimate interests against the employee's concern regarding the possible loss of livelihood, a result strongly disfavored by public policy in New York."[102]  Cenveo asserts that it is only seeking to prevent defendants from unlawfully raiding its most valuable and unique employees, in violation of the contractual and fiduciary duties to which the Kristels agreed.[103]  However, Cenveo has not shown a direct business or profit decline as a result of the departure of these individuals or that further raiding would render

---

[100]    *See id.* at 915.

[101]    *See* 306 N.Y. at 178.

[102]    *Ticor Title Ins. Co.*, 173 F.3d at 69.

[103]    *See* Pl. Mem. at 29.

Cenveo unable to continue to operate.[104]  At best, Cenveo relies on the declining

productivity of the Altoona plant, which is more plausibly explained by the general

"economic downturn" and declines in the commercial printing market – as stated in

Cenveo's own public filings.[105]  Furthermore, an injunction would impose an

undue hardship upon current Cenveo employees.  As a result, the balance of the

hardships does not tip decidedly in Cenveo's favor, and Cenveo is not entitled to a

preliminary injunction.

### 4.     Aiding and Abetting Breach of Fiduciary Duty Claim Against Diversapack

"A claim for aiding and abetting a breach of fiduciary duty requires:

(1) a breach by a fiduciary of obligations to another, (2) that the defendant

knowingly induced or participated in the breach, and (3) that [the] plaintiff suffered

damage as a result of the breach."[106]  Because Cenveo has failed to demonstrate a

---

[104]     *Cf. Frederick Chusid & Co.*, 279 F. Supp. at 919 (finding that the balance of hardships tipped decidedly in the plaintiff's favor where it faced the possibility of "losing such a large part of its staff that it might be unable to continue as a viable business organization").

[105]     *See* 6/27/09 Cenveo 10Q at 28; 3/17/09 Cenveo Tr. at 3 (Cenveo CFO Mark Hiltwein's acknowledgment that Cenveo has suffered economic losses because of the general economic downturn and the state of the commercial envelope industry).

[106]     *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006) (quotation omitted).

31

likelihood of success on the merits of the underlying breach of fiduciary duty claim

against the Kristels (or a sufficiently serious ground for litigation), Cenveo's aiding

and abetting claim against Diversapack cannot support the grant of a preliminary

injunction.

### 5.     Tortious Interference with Contract Claim Against Diversapack

To state a tortious interference with contract claim under New York

law, "a plaintiff must demonstrate the existence of a valid contract, the defendant's

knowledge of the contract's existence, that the defendant intentionally procured a

contract breach, and [the breach resulted in] damages to the plaintiff."[107]  Because

Cenveo has failed to demonstrate a likelihood of success on the merits or

sufficiently serious questions going to the merits of the underlying breach of

contract claim against the Kristels, Cenveo's tortious interference with contract

claim against Diversapack cannot support the grant of a preliminary injunction.

### 6.     Tortious Interference with Employment Relations Claim Against All Defendants

Cenveo alleges a claim for tortious interference with employment

relations against all defendants.  Cenveo asserts that a claim for tortious

---

[107]     *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 124-25 (2d Cir. 2008) (citing *International Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 595 (2d Cir. 1996) and *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 424 (1996)).

32

interference with employment relations is stated where the plaintiff can show that a "'third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice.'"[108]  However, this Court has found no case – and Cenveo points to none – where the employer, as opposed to the allegedly wrongfully terminated employee, brings such a claim.[109]  Therefore, Cenveo's claim fails on this ground alone.

Even if Cenveo could bring such a claim, Cenveo has not shown a likelihood of success on the merits or raised sufficiently serious questions to make this claim a fair ground for litigation.  Cenveo has not provided any facts – or even allegations – that the defendants engaged in fraud, misrepresentation, or threats, to lure away Cenveo employees.  At best, Cenveo relies on the inadmissible double hearsay proffered by Ball to argue that the Kristels made misrepresentations about Cenveo at the Kristel's April 2009 party.[110]  Yet, Alan Kristel - as well as party

---

[108]    Pl. Mem. at 29 (quoting *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001)).

[109]    *See, e.g.*, *Albert*, 239 F.3d at 274 (terminated employee sued third parties for tortiously interfering with his employment relationship with employer); *Finley v. Giacobbe*, 79 F.3d 1285 (2d Cir. 1996) (same); *Sullivan v. Brodsky*, No. 07 Civ. 0003, 2009 WL 2516838, at *4 (S.D.N.Y. Aug. 17, 2009) (same).

[110]    *See* Ball Decl. ¶ 27 (relying on an unidentified third party as the source of his allegations regarding the Kristel's statements).

33

attendees Knoesel, Wilt and Harber – all dispute that they, or any other Cenveo employee, discussed possible employment with Diversapack at the bar mitzvah or that the Kristels made any disparaging or critical comments about Cenveo.[111] Without further substantiation or identification of the third party from whom Ball learned of the Kristels' allegedly false statements, Ball's assertion is inherently untrustworthy and is excluded from consideration. Accordingly, Cenveo has not established that it is likely to succeed on the merits of this claim or raised sufficiently serious questions going to the merits and that the balance of the hardships would tip decidedly in its favor.

## V.    CONCLUSION

For the foregoing reasons, Cenveo's motion for a preliminary injunction is denied. The Clerk of the Court is directed to close this motion (Docket No. 3). A conference is scheduled for October 15, 2009 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              October 1, 2009

---

[111]      *See* Kristel Decl. ¶ 27; Harber Decl. ¶ 16; Wilt Decl. ¶ 12; Knoesel Decl. ¶ 19.

34

## -Appearances-

**For Plaintiff:**

Ned H. Bassen, Esq.
Jason Habinsky, Esq.
Alexander Bogdan, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

**For Defendants Ira B. Kristel and Alan J. Kristel:**

William B. Wachtel, Esq.
Julian Schreibman, Esq.
Wachtel & Masyr, LLP
110 East 59th Street
New York, New York 10022
(212) 909-9500

**For Defendant Diversapack LLC:**

Alan M. Koral, Esq.
Michael Goettig, Esq.
Vedder Price P.C.
1633 Broadway, 47th Floor
New York, New York 10019
(212) 407-7700